SUPERINTENDENT OF INSURANCE OF the STATE OF NEW YORK, as Liquidator of Manhattan Casualty Company, Plaintiff,

v.

BANKERS LIFE AND CASUALTY COMPANY, Irving Trust Company, Belgian American Banking Corporation, Belgian American Bank & Trust Company, Garvin, Bantel & Company, New England Note Corporation, George K. Garvin, John F. Sweeny, the Estate of Standish T. Bourne, by Standish T. Bourne, Jr., as Executor, the Estate of James F. Begole, by Patricia C. R. Begole, Executrix, Defendants.

No. 63 Civ. 2490.

United States District Court
S. D. New York.

June 3, 1969.

Arnold Bauman, New York City, for plaintiff.

Jacobs, Persinger & Parker, New York City, for defendant Bankers Life and Casualty Co.; Irving Parker, Isaac M. Bayda, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Belgian-American Banking Corp. and Belgian-American Bank & Trust Co.; Michael M. Maney, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

The issue for decision is another illustration of the recurring problem whether plaintiff's claim belongs in the state courts or whether plaintiff has stated a cause of action under the federal securities laws—the Securities Act of 1933 (1933 Act), 15 U.S.C. § 77a et seq. (1964) and the Securities · Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78a et seq. (1964), and the pertinent rules and regulations of the Securities and Exchange Commission. This question is posed by motions made by three of the defendants to dismiss the complaint.

The movants are defendants Bankers Life and Casualty Company ("Bankers Life"), Belgian American Banking Corporation ("Belgian American Banking"), and Belgian American Bank and Trust Company ("Belgian American Trust").

The grounds of the motions are (1) that there is lack of jurisdiction over the subject matter; (2) that the complaint fails to state a claim upon which relief can be granted; and (3) that plaintiff lacks the requisite standing to recover damages for alleged violations of the 1933 and 1934 Acts.

Defendants maintain that plaintiff may not recover because (i) it[1] is neither a defrauded purchaser nor a defrauded seller of securities within the meaning of the 1933 and 1934 Acts, and (ii) these federal statutes have never been and should not be interpreted so as to make them applicable to remedy the injury allegedly resulting from the facts asserted in the complaint. A comprehensive restatement of the facts alleged in the complaint is requisite for a comprehension of the following discussion of the critical legal issues.[2]

---

1. The Superintendent of Insurance of the State of New York is the nominal plaintiff. Since he, as Liquidator, has been vested with all rights of the Manhattan Casualty Company (hereinafter "Manhattan"), the rights he seeks to assert are precisely those possessed by Manhattan at the time of his appointment as Liquidator. Consequently, the questions of standing to initiate suit and of injury will be determined as if Manhattan itself had brought suit.

2. These motions were made pursuant to an order entered by District Judge Sylvester J. Ryan on June 19, 1968 denying, without prejudice, a motion for summary judgment under Fed.R.Civ.P. 56 (b), (c) because subject matter jurisdiction was doubtful. In light of that motion and its disposition, this Court will not treat the instant motions as motions for summary judgment by looking outside the face of the pleadings. The Court will rule on the questions of jurisdiction and the sufficiency of the complaint solely on the basis of its allegations.

The complaint, however, does not contain "a short and plain statement" (Fed. R.Civ.P. 8(a)) of the claim; its averments are not "simple, concise and direct" (Fed.R.Civ.P. 8(e)); and the intracacies of the pleaded transactions cannot immediately be interrelated.

As a consequence, the Court has been compelled to undertake the task of describing the sequence of events as coherently as the complaint permits. The Court has noted, when necessary, the gaps in the narrative which were filled through other sources (these facts not playing a part in the disposition of the motions) and those gaps which remain void.

## EVENTS PRIOR TO JANUARY 24, 1962

Manhattan Casualty Company ("Manhattan") was a New York corporation engaged in the insurance business. At the beginning of the period under consideration, Bankers Life was the owner of all of the outstanding shares of Manhattan stock. The management of Manhattan apparently was distinct from that of Bankers Life.

During the fall of 1961, Bankers Life decided to discontinue its ownership of Manhattan. Sometime in November, 1961,[3] Bankers Life, through James W. Bourland, a vice-president of Bankers Life, commenced negotiations for the sale of all the Manhattan stock. The prospective purchasers were two individuals, defendants Standish T. Bourne and James F. Begole. (¶ 19).

At about the time that Bankers Life decided to sell its Manhattan stock, it ousted the defendant John F. Sweeny from the presidency of Manhattan.[4] Sweeny, however, established contact between Begole and Bourne and Bankers Life. Probably at that time, Sweeny also arranged with Begole and Bourne that he should be reinstated as president of Manhattan when, and if, Begole and Bourne acquired control of Manhattan.

The negotiations drew to a successful conclusion. On January 19, 1962, a contract for the purchase and sale of all the Manhattan shares was entered into by Bankers Life (still through Bourland, as its vice-president) and Begole, individually. Begole, alone and in his own name, was to purchase the Manhattan shares. He agreed to deliver to Bankers Life at the closing on January 24, 1962 a bank check or certified check in the amount of $5,000,000. (¶ 20).

The complaint does not charge that any misrepresentations, deceit or non-disclosures had been made or practiced upon any party in connection with this contract of purchase and sale. The complaint is devoid of allegations respecting the net worth of Manhattan or its general financial position; thus, there is nothing upon which to base any finding as to the equity or unfairness of the contract.

*Financing*

Sometime after January 19, 1962 but before the closing date (January 24, 1962), Bourne had stated to Begole that he, Bourne, would arrange for the financing of the stock acquisition. (¶ 21). Bourne made contact with defendant George K. Garvin (a partner in the note brokerage firm Garvin, Bantel & Company, also a party defendant) and asked Garvin to have a bank issue certificates of deposit in the face amount of $5,000,-000 and then to have a bank make a loan, using the certificates as collateral. (¶ 22). Other than the conclusory statement that the purpose of these two transactions was to conceal the scheme to defraud, there is nothing in the complaint's factual allegations that would explain the significance of these two transactions which, taken together, appear to be self-cancelling.

Acting upon Bourne's request, Garvin, prior to January 24, 1962, arranged with Belgian American Trust to issue a certificate of deposit in the face amount of $5,000,000, in the name of Manhattan. (¶ 23). The complaint is silent, however, as to whether Belgian American Trust was informed of the method of payment for this certificate of deposit. Presumably, it was so informed. Garvin also arranged with Belgian American Banking to loan to defendant New England

---

3. Paragraph 18 of the complaint alleges that the acts in furtherance of and connection with the scheme to defraud were commenced in November, 1962. However, it is obvious from the succeeding paragraphs that this date is a typographical error, and that the correct date is November, 1961.

4. This information was conveyed to the Court at oral argument (Transcript, September 10, 1968 at 23–25). Sweeny's former relationship with Manhattan, his discharge by Bankers Life, and his subsequent connection with Bourne and Begole, are important for an understanding of the alleged fraud.

Note Corporation—a company controlled by Bourne—$5,000,000 upon the collateral of the certificate of deposit that would be issued in the name of Manhattan. (¶ 23).

Also in preparation for the closing of January 24, 1962, Garvin met with C. Joseph Gunther, an officer of defendant Irving Trust Company. Gunther agreed to bring to Garvin's office on January 24, 1962 a check in the amount of $5,-000,000 payable to Bankers Life. This check was to be paid for by the delivery of various securities from Chemical Bank New York Trust Company to Irving Trust Company. (¶ 24).

## TRANSACTIONS OF JANUARY 24, 1962

*The Closing, the Payment for the Manhattan Shares, and the Sale of Manhattan's Portfolio*

On the morning of January 24, 1962, Bourne, Sweeny, Begole, and Gunther appeared at Garvin's office. Begole then executed two notes,[5] both payable to New England Note Corporation. One was in the amount of $5,000,000, interest payable at 7½ per cent; the other in the amount of $250,000, interest payable at 5 per cent. The complaint is silent as to whether these notes were delivered. Begole also executed in favor of New England Note Corporation an assignment of the Manhattan stock that he would receive. (¶ 25). The economic purpose underlying these transactions is neither explained nor readily discernible.

Sweeny, Begole, Garvin, and Gunther then went to Manhattan's office for the closing of the sale of Manhattan stock. Gunther handed the $5,000,000 Irving Trust Company check to Leo Lehane, an executive vice-president of Bankers Life, and received in return an unsealed envelope. (¶ 26). The complaint contains no other allegations pertaining to the actual closing. It would be sheer specula-

tion to assume that the envelope did or did not contain the shares of Manhattan stock.

Nevertheless, Begole and Bourne presumably did obtain possession of the shares of Manhattan stock at some point because (as will be detailed later) these shares apparently were physically tendered as security for a loan.

Once the ownership of the shares of Manhattan stock apparently changed hands on January 24, 1962, the following took place: United States Government securities owned by Manhattan, in the face amount of $5,155,000, were delivered through Garvin, Bantel & Company to Irving Trust Company.

During the same day of January 24, 1962, Garvin, Bantel & Company sold these securities for Manhattan's account. Irving Trust Company delivered these securities to the purchaser and received the proceeds of $4,854,552.67, which amount it then credited to an account in Manhattan's name.

Manhattan (by some person not named) then transferred some cash to Irving Trust Company, which amount was also credited to this Manhattan account.

Finally, the $5,000,000 check of Irving Trust Company that Gunther had handed to Leo Lehane of Bankers Life was charged against this same Manhattan account in Irving Trust Company (¶ 27) —which had been built up by the crediting of the proceeds of the sale of Manhattan's portfolio of United States Government securities plus the additional Manhattan cash.

The net effect of the foregoing series of financial manoeuvres appears to be, up to this point, as follows:

(i) Bankers Life received $5,000,000 in cash for which it had ostensibly delivered all of its Manhattan stock;

5. There are no allegations respecting the obligor, *i. e.*, whether these were personal notes of Begole or were to become obligations of Manhattan. It seems more likely that they were personal obliga-

tions of Begole because of the assignment of the shares by Begole to New England Note Corporation, which may have been intended as an assignment for security purposes.

(ii) Presumably, Begole (or possibly Bourne—through New England Note Corporation—as a result of Begole's prior assignment of the Manhattan stock Begole would receive) owned all of the stock of Manhattan;

(iii) Manhattan's portfolio of United States Government securities had been sold off;

(iv) Manhattan transferred some cash to Irving Trust, thereby further building up its account;

(v) Irving Trust applied the total credit—created out of the Manhattan portfolio proceeds and the Manhattan cash—to the payment of the $5,000,000 Irving Trust check which Gunther had given Lehane of Bankers Life;

(vi) As a result, Manhattan's net assets were diminished by approximately $5,000,000; and

(vii) Payment of $5,000,000 to Bankers Life for the purchase of its Manhattan stock was effected by using Manhattan's own assets to pay for all of its stock, which Begole or Bourne thereby obtained without using a dollar of their own money.

Though the complaint is devoid of factual allegations on the point, apparently Sweeny assumed the office of president of Manhattan immediately after the acquisition of the Manhattan shares.[6] Conceivably it was he who directed the Chemical Bank to deliver Manhattan's portfolio of United States Government securities to Irving Trust, authorized the sale of these securities, and then transferred Manhattan cash to Irving Trust in order to cover completely the $5,000,000 Irving Trust check payable to Bankers Life.

The complaint is explicit, however, in charging that Sweeny, in his capacity as president of Manhattan, effected other transactions on January 24, 1962.

### The Certificates of Deposit

Later that day, Gunther, at the request of Garvin, Bantel & Company, brought another Irving Trust check in the amount of $5,000,000, payable to Belgian American Trust, to the offices of Belgian American Trust. Gunther gave the check to Sweeny who delivered it to someone at Belgian American Trust. Belgian American Trust then issued a six-months certificate of deposit in the amount of $5,000,000 in the name of Manhattan, pursuant to Garvin's prior discussions with Belgian American Trust. Sweeny received the certificate of deposit and, in his capacity as president of Manhattan, immediately endorsed it to New England Note Corporation. (¶ 28).

Bourne, as president of New England Note Corporation, accepted the certificate of deposit from Sweeny; and, in turn, Bourne endorsed the certificate to Belgian American Banking.[7]

Belgian American Banking then made a six-months loan of $5,000,000 to New England Note Corporation and took possession of the certificate of deposit as collateral.

Belgian American Banking drew a $5,000,000 check, apparently payable to Irving Trust Company and delivered it to Gunther. (¶ 28).

To recapitulate for a moment at this point:

(1) Irving Trust Company in effect exchanged its $5,000,000 check payable to

---

6. In light of allegations that Bourne was required by Irving Trust, through Garvin, to execute certain backdated letters (¶ 32) and that Irving Trust made various entries after January 24, 1962 for the purpose of concealing the transactions of January 24, 1962 (¶ 31), the absence of any similar allegations respecting Sweeny's grant of authority might indicate that Begole, in fact, did immediately name a board of directors, which met and appointed Sweeny as president, grant-

ing him sufficient authority to effect the various transactions on Manhattan's behalf.

7. The exact relationship between Belgian American Banking and Belgian American Trust was never explained in the complaint, nor at oral argument nor in counsel's briefs. It does not appear that, for purposes of these motions, this information is crucial.

Belgian American Trust for a $5,000,000 check drawn by Belgian American Banking, payable to Irving Trust Company.

(2) Belgian American Trust issued a $5,000,000 certificate of deposit which in reality was paid for by the $5,000,000 emanating from Belgian American Banking in the form of the loan in the same amount made by Belgian American Banking to New England Note Corporation and collateralized by the very same $5,000,000 certificate of deposit of Belgian American Trust.

(3) The certificate of deposit issued by Belgian American Trust was issued in the name of Manhattan, though Manhattan did not pay for it and was in fact only an intermediate conduit for this certificate of deposit as it made its way from Belgian American Trust to Belgian American Banking.

At the same time that Belgian American Banking made the $5,000,000 loan to New England Note Corporation, it made another loan of $250,000 to New England Note Corporation and received as security the Manhattan shares assigned by Begole to New England Note Corporation. (¶ 28). Once again the complaint is not precise and does not allege specifically whether the Manhattan shares were actually delivered to Belgian American Banking.

The proceeds of this $250,000 loan were deposited in Belgian American Trust and the following amounts totalling $225,000 were disbursed: Garvin, Bantel—$25,000; Begole—$50,000; Bourne—$50,000; Belgian American Banking—$100,000. (¶ 28). It would be supposititious to attempt any explanation for the payment of the above $225,000. The complaint does not allege that this transaction constituted fraud, but only that the various transactions with the Belgian American banks were effected for the purpose of concealing the fact that Manhattan's assets had been reduced by the sale of its securities—a fact which does, indeed, emerge clearly from the above labyrinthine transactions.

EVENTS SUBSEQUENT TO
JANUARY 24, 1962

The complaint alleges other events which occurred subsequent to January 24, 1962, such as the making of entries by Irving Trust Company for the purpose of concealing the transactions of January 24, 1962 (¶ 31); and, for similar purposes, the execution by Bourne of various backdated letters which were given to Garvin on January 29, 1962 (¶ 32).

On July 24, 1962, the six-months certificate of deposit matured; the loan by Belgian American Banking to New England Note Corporation and the loans by New England Note Corporation to Begole fell due. Belgian American Trust then issued a new six-months certificate of deposit in Manhattan's name in the amount of $5,000,000. This certificate was endorsed by Begole (as chairman of Manhattan) and Sweeny (as treasurer) and posted as collateral for the Belgian American Banking-New England Note Corporation loans which were then extended to January 24, 1963. (¶ 33). The Manhattan stock at this point appears to be physically in the possession of Belgian American Banking as collateral for the loans. Finally, Begole's loans ($5,000,000 and $250,000) from New England Note Corporation were also extended to January 24, 1963. (¶ 33). It is alleged that these transactions were entered into for the purpose of furthering the scheme to defraud. (¶ 33).

While it would appear from the foregoing that Belgian American Banking was in possession of the $5,000,000 certificate of deposit, on August 30, 1962 Sweeny (in his capacity as president of Manhattan) wrote Belgian American Trust that he was forwarding to Belgian American Trust a non-negotiable certificate of deposit in the amount of $5,000,000 which was to be paid at maturity into Manhattan's current account at Belgian American Trust. Sweeny also stated that he was forwarding a non-negotiable certificate of deposit in the amount of $500,000 issued by the First National Bank of Boston, which certificate was to

be held by Belgian American Trust in safekeeping. There are no allegations respecting the purchaser of this certificate, the source of funds for its issuance, nor any fraudulent activity in connection with it. Again, the complaint alleges that the purpose of this legerdemain was to conceal the actual reduction in Manhattan's assets and to create the misleading impression that Manhattan had $5,500,000 more in unencumbered assets than it, in fact, did have. (¶ 34).

*Repayment of Belgian American Banking Loans*

Sometime in January, 1963, Belgian American Banking made known that it would not renew or extend its loans to New England Note Corporation, which notes fell due on January 24, 1963. (¶ 35). Accordingly, beginning on or about January 20, 1963, Bourne and Begole initiated another series of camouflaging transactions.

*Firstly,* Bourne asked Garvin, Bantel to arrange to replace the certificates of deposit which undoubtedly had been carried as assets upon Manhattan's books and the proceeds of which would be required to repay the Belgian American Banking loans. Garvin, Bantel borrowed $5,500,000 from Marine Midland Bank and Trust Co. and delivered the funds to Irving Trust Company. Irving Trust Company, on January 21, 1963, issued, at Begole's request, certificates of deposit in the amount of $5,500,000, apparently with Manhattan as payee.[8] These certificates were delivered to Garvin, Bantel. (¶ 36).

*Secondly,* on January 25, 1963, Belgian American Trust credited Manhattan's account with the proceeds and interest of the two certificates of deposit referred to in Sweeny's letter of August 20, 1962 —$5,075,616.44 representing the amount credited with respect to the Belgian American Trust certificate of $5,000,000 and $515,361.18 representing the proceeds of the First National Bank of Boston certificate of $500,000. (¶ 37).

At Manhattan's request, Belgian American Trust issued a check in the sum of $5,500,000 to Irving Trust Company and charged Manhattan's account.

Irving Trust Company thereupon drew its own check in favor of Belgian American Banking in the amount of $5,250,000 and charged this amount of $5,250,000 against the credit established by the $5,-500,000 check which it had received from Belgian American Trust. The Irving Trust Company check in the amount of $5,250,000 was then applied by Belgian American Banking to the New England Note Corporation loans (of $5,000,000 and $250,000) then due and owing to Belgian American Banking. (¶ 37).

It is alleged that the exchange of checks between Belgian American Trust and Irving Trust Company and between Irving Trust Company and Belgian American Banking took place at the same time at a meeting held on January 25, 1963 at the office of one (or possibly both) of the Belgian American banks. (¶ 37).

As a result of these transactions, it now appeared that Manhattan was the payee of a $5,500,000 certificate of deposit (issued by Irving Trust Company) which, however, had been delivered physically to Garvin, Bantel and then undoubtedly used by Garvin, Bantel as security for its loan of $5,500,000 from Marine Midland Bank.[9]

8. Paragraph 36 is silent as to the payee of the Irving Trust certificates. However, since paragraph 39 alleges that Irving Trust certified to the State Insurance Department that it was indebted to Manhattan in the amount of $5,500,000 as evidenced by certificates of deposit, and since the alleged scheme of concealing the diminution of assets would not be effective unless the certificates were in Manhattan's name, it is a reasonable assumption that they were so issued.

9. There are no allegations, however, regarding the pledge or assignment of this certificate as security nor any allegations regarding an assignment or endorsement by Manhattan of the Irving Trust Company certificate of deposit (of $5,500,000) which presumably would be necessary in order to make this certificate acceptable to Marine Midland Bank as security for Garvin, Bantel's loan.

Manhattan also had approximately $90,000 on deposit in Belgian American Trust representing interest earned by the certificate of deposit and a balance of $250,000 in Irving Trust Company representing the difference between the $5,500,000 check received by Irving Trust Company from Belgian American Trust and the $5,250,000 check issued by Irving Trust Company to Belgian American Banking. There are no allegations respecting interest on the Belgian American Banking-New England Note Corporation loans; and it is likely that Manhattan paid this interest by using the cash balances on deposit in Belgian American Trust and Irving Trust.

Other than these possibilities arising from the interest earned by the certificates of deposit and the interest payable on the loans, the Belgian American banks, as of January 25, 1963, do not figure in any financial transaction.

On April 18, 1963, Belgian American Banking returned to Begole and Sweeny the shares of Manhattan stock which it had received as collateral on the New England Note Corporation loan. (¶ 38).

Finally, on May 15, 1963, allegedly for the purpose of concealing the diminution of Manhattan's assets, Irving Trust Company certified to the New York State Insurance Department that Manhattan had on deposit at Irving Trust Company $5,500,000, as evidenced by the certificates of deposit (payable to Manhattan) issued by Irving Trust on January 21, 1963. The certification included statements that the certificates of deposit were free of all liens, claims, or incumbrances and were not held as security for any loan. (¶ 39). These certificates of deposit, as previously noted, had in fact been delivered to Garvin, Bantel.

The net effect of the myriad financial manoeuvres was that an individual (Begole) or a group of individuals (Begole, Bourne, et al.) obtained control of Manhattan by (1) having Irving Trust Company deliver its $5,000,000 check to Bankers Life (the then sole stockholder of Manhattan), (2) receiving all of Bankers Life's shares of Manhattan, and (3) repaying Irving Trust Company by selling Manhattan's portfolio of United States Government securities and forwarding the proceeds plus some additional cash to Irving Trust Company.

In essence, Manhattan's corporate funds that should have been kept available to meet Manhattan's creditors' and policyholders' claims were thus unlawfully used by Begole for the noncorporate, private purpose of enabling Begole (and those in concert with him) to acquire all of Manhattan's shares.

Since Manhattan, a solvent corporation, was thereby rendered insolvent, the corporation itself was victimized. But, inasmuch as Begole was Manhattan's sole stockholder, the economic injury was to be borne only by Manhattan's creditors and policyholders.

It is impossible to ascertain with any degree of certainty from the face of the complaint who benefitted from the transaction. Bourne, Sweeny, Begole, Garvin or all of them in concert, may have masterminded and gained from the scheme. As previously noted, Bourne, Begole, Garvin, Bantel and Belgian American Banking received various amounts of cash, totalling $225,000, originating out of the $250,000 loan by Belgian American Banking to New England Note Corporation.

Indeed, if Manhattan had a net worth on January 24, 1962 substantially below $5,000,000, Bankers Life may have been the ultimate beneficiary. Resolution of this puzzlement is not required to decide the present motions.

## PLAINTIFF'S LEGAL THEORY AND MOVANTS' CHALLENGES

Plaintiff claims that these transactions, when integrated, constitute violations of section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) because all of the defendants, by their respective participation, employed a device, scheme and artifice to defraud Manhattan. The precise applicability of section 17(a) is never articulated in the complaint. Neverthe-

less, plaintiff's apparent position is that the bootstrap acquisition of control by Begole, Sweeny and Bourne whereby Manhattan's assets rather than outside funds were the source of the purchase price of Manhattan's shares was fraudulent insofar as Manhattan was concerned. Moreover, in order to retain control of Manhattan without disclosing the means of financing the acquisition of the Manhattan shares, defendants, as part of the same scheme, finagled records and executed intricate financial transactions to conceal and suppress the truth.

Bankers Life and the two Belgian American banks have moved to test the legal sufficiency of this theory as applied to the facts alleged in the complaint. More particularly, these defendants seek an order, pursuant to Fed.R.Civ.P. 12(c), (h), granting judgment on the pleadings and dismissing the complaint as to them on the grounds that the Court lacks federal question or diversity jurisdiction; that plaintiff lacks standing to recover damages for violations of section 17(a) of the 1933 Act; and that the complaint fails to state a claim upon which relief can be granted.

■ In the context of complaints alleging violations of the securities acts, there is no significant distinction between dismissal for lack of jurisdiction and dismissal for failure to state a cause of action. Federal jurisdiction depends on the existence of a federal question, *i. e.*, the violation of a provision of one of the securities acts. Should the Court determine that the facts alleged do not make out a violation of federal law, and consequently fails to state a claim, the Court, in effect, has also determined that there is no federal question, and thus no jurisdiction. *See* Britt v. Cyril Bath Co., 290 F.Supp. 934 (N.D.Ohio 1968). Therefore, the Court will not attempt, as a matter of formal analysis, to deal separately with these two grounds. Because the same issues of law are raised by both grounds, they will be discussed simultaneously.

The Court initially, however, directs its attention to the question of standing which can be decided without reference to the merits of the claim since this attack on the complaint assumes *arguendo* that it does allege an actual violation of the securities acts and that the Court has jurisdiction.

## WHO MAY RECOVER FOR ALLEGED VIOLATIONS OF THE ANTI-FRAUD PROVISIONS OF THE SECURITIES ACTS?

Defendants, in their memoranda, claim that plaintiff may not recover for violations of section 17(a) of the 1933 Act because that section gives rise to a cause of action in a defrauded purchaser only, and that it is obvious from the face of the complaint that Manhattan was not a purchaser of its own stock. At oral argument and in its briefs, plaintiff presents a number of arguments in refutation.

Plaintiff's position is that, for purposes of these motions, it is not limited to section 17(a) of the 1933 Act (the only section explicitly alleged to have been violated) but that it is entitled to have the motions denied if it has standing and if it makes out a claim under *any* federal statute. Plaintiff then asserts that section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1964) and S.E.C. Rule 10b–5 are also material; that the complaint does state a cause of action under that section; and that plaintiff has standing to sue for damages resulting from violations of section 10(b) of the 1934 Act and section 17(a) of the 1933 Act.

■■ The Court is not restricted to the particular legal theory of recovery or jurisdictional basis alleged in the complaint. If the facts are alleged with reasonable clarity so as to give adequate notice of the transaction, and if plaintiff is entitled to recover under any legal theory, the complaint is sufficient. 1A Barron & Holtzoff, Federal Practice and Procedure § 276.1 (Wright ed. 1960); 2A J. Moore, Federal Practice ¶ 8.14 (2d ed. 1968).

Moreover, because the operative language of section 10(b) and Rule 10b–5 is so similar to that of section 17(a) of

the 1933 Act, the Court will consider the applicability of these provisions. *See* Hoover v. Allen, 241 F.Supp. 213, 226 n. 7 (S.D.N.Y.1965).

█ Only a defrauded purchaser may recover under section 17(a) of the 1933 Act. The statute provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

This statute was aimed at fraudulent practices by which sellers of securities could defraud or deceive purchasers. The very purpose of the promulgation of Rule 10b–5 under the 1934 Act was to prohibit individuals or companies from buying securities if they engage in fraud in their purchase. The objective of Rule 10b–5 was to make the same prohibitions contained in section 17(a) of the 1933 Act applicable to purchasers as well as to sellers. *See, e. g.,* Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); III L. Loss, Securities Regulation at 1423–30 (2d ed. 1961); A. Bromberg, Securities Law: Fraud at 19–20 (1968).

The requirement of being a defrauded purchaser to recover for a violation of section 17(a) has even more recently been upheld. *See, e. g.,* Schoenbaum v. Firstbrook, 268 F.Supp. 385, 396 (S.D. N.Y.1967), aff'd, 405 F.2d 200 (2d Cir.), rev'd on other grounds en banc, 405 F.2d 215 (2d Cir. 1968); Colonial Realty Corp. v. The Curtis Publishing Co., CCH Fed.Sec.L.Rep. ¶ 92, 105 (S.D.N.Y. 1967); *cf.* Hoover v. Allen, 241 F.Supp. 213, 223 (S.D.N.Y.1965).

██ Rule 10b–5, however, is more expansive than section 17(a) of the 1933 Act. It prohibits fraud or deception by either a purchaser or seller; and its operative language is "in connection with the purchase or sale of any security" as distinguished from the phrase "in the offer or sale of any securit[ies]" which appears in section 17(a) of the 1933 Act.[10] Nevertheless, the standing requirement appears to differ only in

10. The texts of section 10(b) and Rule 10b–5 are hereafter set forth:

"Section 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors."

"Rule 10b–5. Employment of Manipulative and Deceptive Devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

that defrauded sellers as well as purchasers are included in the permissible class of potential plaintiffs.

In Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051 (1952), plaintiff sought to prosecute a derivative suit against the former president and major shareholder of the corporation who allegedly had violated section 10(b) and Rule 10b–5 in rejecting, as president, an allegedly favorable merger offer and who then sold his stock to another company at a substantial premium. In affirming the district court's dismissal of the complaint, the court, *inter alia,* held that the action could not be maintained in the corporate name in the absence of an allegation that the plaintiff corporation was either a defrauded purchaser or 'seller of securities. This holding has been consistently applied. *See, e. g.,* Chashin v. Mencher, 255 F.Supp. 545, 548 (S.D.N.Y.1965) and cases there cited.

Plaintiff contends that *Birnbaum* is no longer controlling doctrine. It argues that recent case law (mostly developed by the Second Circuit) has eroded the validity of *Birnbaum* and the limitation of standing to defrauded purchasers or sellers.

The Court rejects plaintiff's reading of recent decisions. Though there have been, literally, dozens of cases raising the issue since *Birnbaum,* not one has permitted a plaintiff who has been held to be other than a "purchaser or seller" (as those terms have been interpreted) to maintain an action for damages under Rule 10b–5.

In Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), a case much relied on by plaintiff, the court did permit the trustee in bankruptcy to sue in behalf of a corporation whose stock had been issued, without registration, and then publicly distributed by some of the defendants.

Plaintiff alleged a violation of Rule 10b–5 in that the corporation's transfer agent was induced to issue these shares on the basis of fraudulent representations made to the agent by former officers of the bankrupt. The court held that the corporation could maintain its action for the reason that the issuance of stock was a "sale" and since it did not receive full consideration for the valuable shares issued, the corporation was thus a defrauded "seller." *Hooper,* thus, manifestly does not indicate the demise of the purchaser-seller requirement.

*Hooper* did serve as the genesis for a long string of cases that have permitted corporations to sue for damages when they were the victim of a securities fraud. Yet, in every case, the corporation either qualified as a "seller" since it had issued new shares, or as a purchaser when it redeemed shares or purchased treasury stock.

Other cases are also relied upon by plaintiff to support its thesis that the authority of *Birnbaum* has become attenuated. Ruckle v. Roto American Corporation, 339 F.2d 24 (2d Cir. 1964), upheld the right of a defrauded *issuer* to recover damages because preventing the perpetration of fraud upon an issuer with the consequent distribution of newly issued and watered stock was one of the chief reasons for the enactment of the securities laws. 339 F.2d at 28. Since an "issuer" is a seller (per *Hooper*), this result is not inconsistent with the *Birnbaum* purchaser-seller requirement. And, although *Ruckle* distinguished *Birnbaum* and Howard v. Furst [11] on the grounds that the corporations in those cases had not sustained injury, it is clear from the rationale for the *Ruckle* decision that the mere existence of corporate injury was not the crucial, decisive factor; the emphasis was on the spread of overvalued securities resulting from the fraud on the corporation.

---

11. 238 F.2d 790 (2d Cir. 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed. 2d 759 (1957) (shareholders may not sue derivatively for injury growing out of S.E.C. proxy rule violations).

Nor do the other cases cited by plaintiff support its *Birnbaum* erosion thesis. In Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), the court held that a minority shareholder who, pursuant to a short form statutory merger, was forced either to sell his shares to the surviving corporation or to retain shares in a defunct corporation was a "seller", though he retained his shares. The court specifically disclaimed any intention to depart from the traditional purchaser-seller requirement and decided that, under the particular circumstances, plaintiff was, as a practical matter, a seller.

In A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967), the court reversed the dismissal of a complaint which charged that defendant had employed a scheme in refusing to pay for securities he had ordered from plaintiff-broker. The court noted, explicitly, that plaintiff in that case was a purchaser and thus there was no need to delve into the question of whether a broader standing requirement should be adopted. 375 F.2d at 397 n. 3.

It is true that *Brod* implicitly criticized *Birnbaum* in the statement: "Nor do we think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities'. We believe that § 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." 375 F.2d at 397. The language the Court of Appeals believed too limited is that of *Birnbaum*.

An analysis of the decision in *Birnbaum*, however, discloses that there were at least two distinct reasons for dismissing the complaint [12]—the failure of the allegations to state a cause of action, and the lack of standing in the corporation to recover for violations of the securities laws when the corporation was neither a defrauded purchaser nor defrauded seller. The language quoted by *Brod* was the *Birnbaum* court's rationale for dismissal for failure to state a claim; so too, the only issue involved in *Brod* was the question of whether the facts alleged constituted a violation of Rule 10b-5. And thus, while *Brod* must be read as modifying *Birnbaum* on this issue, *Birnbaum's* standing requirements have not been altered.[13]

12. One commentator has also noted the tendency to confuse the distinct grounds for decision in *Birnbaum* which results from "an uncritical reading of the general language * * *" *See* A. Bromberg, *supra* at 88.1.

13. Though not cited by plaintiff to this Court, two other cases have been relied on as authority for the *Birnbaum* "erosion" or "demise" theory. *See* Lowenfels, The Demise of the Birnbaum Doctrine: A New Era For Rule 10b-5, 54 Va.L.Rev. 268 (1968). In Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967), the court denied, on the grounds of failure to prove irreparable harm, an application for an order enjoining a tender offer allegedly steeped in material misrepresentations and omissions. Though the court reached the merits in a suit brought by the corporation being acquired and two of its shareholders, it specifically refrained from deciding the question of standing. 383 F.2d at 842.

In Mutual Shares v. Genesco, 384 F.2d 540 (2d Cir. 1967), the court did decide that one need not be a purchaser or seller in a suit for an injunction, but held, however, that the trial court's dismissal of the damages claim was correct. *See* 384 F.2d at 547. The injunction was against a continuing deceitful manipulation of the market price of publicly-owned stock; and this conduct was held to create a claim under section 10(b) and Rule 10b-5. The Court explicitly stated that the claim for equitable relief required proof of fewer elements than would a claim for damages.

Lowenfels, *supra*, does not distinguish between the two separate grounds for decision in *Birnbaum*; and thus fails to note that *Brod* modifies *Birnbaum* only with respect to the ground based on failure to state a claim.

Weitzen v. Kearns, 271 F.Supp. 616, 622 (S.D.N.Y.1967), and Entel v. Allen, 270 F.Supp. 60, 69 (S.D.N.Y.1967) —both decided by the same judge—ap-

Indeed, in Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968), the Court of Appeals appeared to foreclose any argument respecting the demise of the *Birnbaum* purchaser-seller requirement:

"It has long been the rule in this circuit that to maintain an action under § 10(b) of the [1934] Act and Rule 10b–5 of the Securities and Exchange Commission the plaintiff must have been a seller of the stock involved. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (C.A. 2, 1952), cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Although criticized, Entel v. Allen, 270 F.Supp. 60, 70 (S.D.N.Y., 1967), it is still the rule at least insofar as actions for damages are concerned. Mutual Shares Corp. v. Genesco, Inc., [384 F.2d 540 (C.A. 2)] supra."

## EXPANSION OF THE PURCHASER-SELLER REQUIREMENT?

Plaintiff argues that, even if the purchaser-seller requirement has not yet been expressly overruled or broadened, the various cases which were cited by plaintiff for that proposition, and discussed by the Court above, at least indicate discontent with the narrow *Birnbaum* rule, forcing the Court of Appeals to choose other means to circumvent its rigors (e. g., interpreting term "seller" broadly). Plaintiff thus appears to ask this Court to broaden, in an explicit fashion, the standing requirements. Plaintiff refers the Court to the brief of the Securities and Exchange Commission as amicus curiae in Vine v. Beneficial Finance Co., supra, where the S.E.C. argued for such an expansion. Plaintiff argues that this step would eliminate unnecessary complexities, distinctions, and incentives to clever schem-

ing and would achieve greater justice in the individual case. Memorandum of Plaintiff In Opposition to Motions Pursuant to Rules 12(c) and 12(h) Federal Rules of Civil Procedure at 31.

Other reasons have been advanced by commentators for the abandonment of the purchaser-seller prerequisite. *See*, *e. g.*, Lowenfels, *supra* note 12; Note, The Purchaser-Seller Rule: An Archaic Tool for Determining Standing Under Rule 10b–5, 56 Geo.L.J. 1177 (1968).

The rule that this Court is asked to adopt is that anyone who is injured by a violation of the securities acts may sue to recover damages. The Court declines this invitation to expand the traditional standing requirement.

▮ The Court of Appeals has declined to accede to the repeated requests of plaintiffs and *amici curiae* to enlarge the class of potential plaintiffs in actions for damages arising out of violations of Rule 10b–5. In the light of Greenstein v. Paul, *supra*, the Court does not discern any imminent doctrinal change by the Court of Appeals. In these circumstances, a district judge may not disregard an established principle of law. Accordingly, the Court rules that only a defrauded purchaser or seller may sue for damages arising from a violation of section 10(b) of the 1934 Act and S.E.C. Rule 10b–5.

## IS PLAINTIFF A DEFRAUDED PURCHASER OR SELLER OF SECURITIES?

The complaint charges a violation of the anti-fraud provisions of the 1933 Act in the purchase and sale of the shares of Manhattan stock on January 24, 1962. (¶¶ 1, 18, 40). The seller of these shares was Bankers Life and the purchaser was Begole. (¶ 20).

parently also came to the conclusion that *Birnbaum* was "seriously challenged, if not overruled" by reading *Brod* as questioning *Birnbaum's* holding with respect to standing as well as the scope of Rule 10b–5. However, in Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968), the Second Circuit squarely reaffirmed the continuing

validity of *Birnbaum* as authority for the rule that to maintain an action for damages under section 10(b) and Rule 10b–5 the plaintiff must have been a seller of the stock involved. *See also* Christophides v. Porco, 289 F.Supp. 403 (S.D.N.Y. 1968); Bound Brook Water Co. v. Jaffe, 284 F.Supp. 702 (D.N.J.1968).

From the face of the pleadings, it thus appears that plaintiff—Manhattan—was neither a purchaser nor a seller of the security (shares of Manhattan stock) which was the subject of the alleged fraud.

At oral argument, however, plaintiff's counsel suggested that—in view of the fact that Begole did not furnish any "fresh" consideration for the purchase of the shares and that, ultimately, it was Manhattan's funds which paid for the shares—Manhattan should be considered the purchaser. (Tr. at 30). While it is true that a corporation can be a purchaser of its own stock within the meaning of the securities laws, see, e. g., O'Neill v. Maytag, 230 F.Supp. 235 (S.D.N.Y.), aff'd, 339 F.2d 764 (2d Cir. 1964), a corporation cannot be the purchaser of *all* of its own stock unless the shares were cancelled and a general dissolution occurred. This is so because a corporation cannot maintain its status as a separate or existing entity (or fictional person) without having another entity or individual serve in the capacity of proprietor or owner.

This Court deems, as a matter of law, the fact that plaintiff may have been the ultimate source of funds for the purchase of Manhattan shares (*i. e.*, the proceeds of the sale of Manhattan's portfolio of United States Government securities were received by Irving Trust Company and credited to Manhattan's account, which thereafter was charged with the $5,000,000 check delivered by Irving Trust Company to Bankers Life) insufficient to establish plaintiff as the purchaser of Manhattan shares because it was never intended that plaintiff would take title to those shares. This Court holds that, insofar as section 17(a) of the 1933 Act and section 10(b) of the 1934 Act are concerned, a purchaser of securities is one who was a party to a transaction whereby he was to assume ownership of securities in exchange for valuable consideration. Under this definition, plaintiff fails to achieve the status of purchaser and, consequently, may not assert a cause of action for a violation of the securities laws with respect to the purchase and sale of the Manhattan shares.

Though the complaint alleges fraud only in the purchase and sale of the Manhattan shares, plaintiff now adopts the new position that, as a purchaser of a certificate of deposit, and as a seller of United States Government securities, plaintiff has standing to sue in this action (Tr. at 32–35).

Without commenting on the propriety of ruling on the sufficiency of a complaint based on amendatory allegations presented in open court and not formally set forth in the complaint, the Court concludes that if, within the meaning of the securities acts, fraudulent schemes were employed in connection with the sale of Manhattan's portfolio of United States Government securities, plaintiff, *if damaged*, may maintain a suit to recover. Manhattan was a seller of those securities, though management perhaps breached its duties to the corporation in authorizing or ratifying the sale; and, if the corporation was damaged through fraudulent activities, plaintiff may recover damages.

With respect to plaintiff's standing deriving from its alleged "purchase" of various certificates of deposit,[14] the Court is convinced that plaintiff was not a purchaser, despite the fact that it tendered to Belgian American Trust, Irving Trust Company's check for $5,000,000 and received a $5,000,000 certificate of deposit payable to itself. Since, by prearrangement, this certificate was endorsed to New England Note Corporation which

---

14. The Court's discussion of purchases of certificates of deposit does not refer to the $500,000 First National Bank of Boston certificates of deposit, regarding which the complaint is generally devoid of information. From the facts alleged, it does not appear that any fraudulent act was practiced relative to this certificate, and thus the question of standing is irrelevant.

delivered it to Belgian American Banking as collateral for the $5,000,000 loan from Belgian American Banking to New England Note Corporation, and the proceeds of this loan were given directly to Irving Trust Company in payment for the $5,000,000 check that had paid for the certificate of deposit, this entire transaction was a "wash" and had no economic reality. As such, Manhattan was not a "purchaser" of a "security" but was merely participating as a conduit for the sole purpose of having its name appear as payee which enabled the fraud to become further camouflaged.

The Court is mindful of the argument that Manhattan's portfolio of United States Government securities was the ultimate source of funds for financing all the transactions in the three certificates of deposit and that the misappropriation of the proceeds of the sale of Manhattan's portfolio constituted the fraud. What is of controlling importance is that the facts as pleaded do not portray Manhattan as the purchaser of the two Belgian American Trust certificates of deposit. Neither Manhattan's portfolio nor the proceeds thereof was the immediate consideration for the issuance of these two certificates.

Nor was Manhattan a purchaser of the third certificate of deposit,—the

Irving Trust Company $5,500,000 certificate of deposit which was paid for by the proceeds of the Marine Midland $5,500,000 loan to Garvin, Bantel. Garvin, Bantel and Irving Trust Company were the only parties to the transaction whereby this certificate was issued, although Manhattan was the payee of the certificate. Garvin, Bantel, as previously noted, received physical delivery of the certificate and presumably used this certificate of deposit as collateral for the $5,500,000 loan which initially furnished the consideration for the issuance of the certificate.

■■■ Therefore, the Court need not reach the novel and difficult question of whether certificates of deposit of this nature fall within the statutory definition of the term "security".[14a]

The certificates of deposit in this case were not issued for a security—they were issued for cash and are pieces of paper "evidencing the existence of a time deposit." S.E.C. v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3, 31 (S.D.N.Y.1968). Thus, they would not be deemed "securities" as a species of the class of instruments designated in the statute as "certificate of deposit for a security."

The S.E.C., however, has taken the position that the antifraud provisions

14a. Section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1) (1964), defines the term "security" for the purpose of that act to include "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

Section 3(a) (10) of the 1934 Act, 15 U.S.C. § 78c(a) (10) (1964), sets forth the meaning of the term "security" for the purpose of that act:

"The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

of the securities acts apply to deposit and share accounts in national banks. *See* 31 Fed.Reg. 16, 581, *reprinted in* CCH Fed.Sec.L.Rep. ¶ 77, 421 (1966–67 Transfer Binder).

The Supreme Court, in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), held that withdrawable capital shares in a state-chartered savings and loan association were "investment contracts" and, consequently, constituted "securities" under the 1934 Act. The Court noted that the term "security" " 'embodies a flexible rather than a static principle * * *.' " 389 U.S. at 338, 88 S.Ct. at 554.

Giving the definition of "security" this liberal reading, a certificate of deposit issued for cash by a bank could be considered the equivalent of an "evidence of indebtedness" and would be a "security" within the meaning of the 1933 Act.

The 1934 Act, however, does not include the term "evidence of indebtedness" in the statutory definition. Conceivably, a certificate of deposit issued for cash by a bank might be deemed an "investment contract" or more likely a "note". But the specific exclusion of "any note, draft, bill of exchange, or banker's acceptance" having a maturity of nine months or less from the definition under the 1934 Act, would appear applicable to a six-months' certificate of deposit issued for cash by a bank and which evidences a time deposit made at the issuing bank.

## DOES THE COMPLAINT ALLEGE FACTS CONSTITUTING A VIOLATION OF THE SECURITIES ACTS?

The Court has expressed its conclusion that plaintiff lacks standing to maintain an action for fraud in connection with the purchase or sale of the Manhattan shares and the three certificates of deposit. Were the Court to follow the consequences of this legal conclusion as to standing, it would be unnecessary for the Court to decide the question of whether the acts charged in the complaint with respect to these particular transactions constitute violations of section 17(a) of the 1933 Act and section 10(b) of the 1934 Act.

However, as the Court has also concluded, plaintiff does have standing to maintain an action alleging fraud in connection with the sale of Manhattan's portfolio of United States Government securities. Consequently, the Court must consider whether the acts charged in the complaint constitute violations of section 17(a) of the 1933 Act and section 10(b) of the 1934 Act with respect to that particular security transaction. Plaintiff contends that there was but one pervasive fraudulent scheme, and that all of the various security transactions and other financial manoeuvres were interrelated and cumulative. Since the Court must, for present purposes, accept the allegations of the complaint as true, the Court will determine whether the complaint, considered as a whole, charges conduct which violates section 17(a) of the 1933 Act or section 10(b) of the 1934 Act. Therefore, the Court's discussion will be directed to the complaint as a whole and be general in terms. The Court holds that the allegations of fraud in connection with the sale of Manhattan's portfolio of United States Government securities do not charge conduct violative of the securities acts. The rationale underlying that holding applies equally to the allegations of fraud in connection with the purchase and sale of the Manhattan shares, that is, such allegations do not charge conduct violative of the securities acts. Similarly, if it be assumed that the three certificates of deposit herein constitute "securities" within the meaning of the securities acts, such rationale demonstrates that the allegations of fraud in connection with the purchase of said certificates of deposit do not charge conduct violative of the securities acts.

The gravamen of the complaint is the diminution in Manhattan's assets. This diversion of misappropriation of assets apparently was the essence of the fraud.

The allegations describing subsequent conduct charge only that they were designed to conceal the defendants' misdeeds in a maze of numerous intricate and confusing transactions.

■■■ A viable claim under Rule 10b–5 [15] requires that there have been fraud or deception in connection with the purchase or sale of securities. In interpreting the phrase "in connection with the purchase or sale of any security," it would be relevant to discuss the purpose of the Congressional enactments, and, in so doing, to consider whether the alleged fraud could result in the abuses sought to be curbed or prevented and whether the fraudulent activity otherwise touched on any federal concern.

■■■ The securities acts, and especially the 1934 Act, were intended to prevent fraud and deception, manipulation and inadequate disclosure in the dissemination and trading of securities. The securities acts are not so much concerned with fraud *per se* as with the effect of fraud upon investors and the public interest in maintaining free and open securities markets. 1934 Act § 2(3), 15 U.S.C. § 78b(3); Schoenbaum v. Firstbrook, 405 F.2d 200, 212 (2d Cir.), rev'd en banc, 405 F.2d 215 (2d Cir. 1968); S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 858–860 (2d Cir., en banc, 1968); *cf.* A. T. Brod & Co. v. Perlow, *supra.*

■■■ In order to sustain a complaint alleging fraud under section 10(b) of

the 1934 Act, it must appear with reasonable clarity from the face of the complaint either (1) that a purchase or sale of securities is at the crux of a fraudulent scheme; or (2) that inducing a purchase or sale of securities is the object of a fraudulent scheme; or (3) that fraudulent statements, misstatements, or omissions are made in a manner which is reasonably calculated to influence the investing public, or are of the sort which the reasonable investing public might rely upon; or (4) that the trading process is abused through potential market manipulation or the spread of watered stock.

■■■ The purity of the security transaction and the purity of the trading process are the sole objectives of federal concern. Therefore, the consummation of a security transaction as a mere incident of a fraudulent scheme and the mere fact of injury caused by the fraud, in the absence of any possibility that the fraud might materially affect the purity of the security transaction and the purity of the trading process would not make the fraud federally cognizable. *Cf.* O'Neill v. Maytag, 230 F.Supp. 235, 239 (S.D.N.Y.), aff'd, 339 F.2d 764 (2d Cir. 1964).

■■■ Giving the unique factual allegations of the complaint a most liberal reading, the Court concludes that plaintiff was not the victim of "federal fraud," as defined above.[16] A federal claim is not pleaded by allegations

15. On the premise that the more liberal language of Rule 10b–5 is an indication that its scope is more expansive than that of section 17(a) of the 1933 Act, the Court will discuss this issue only in terms of Rule 10b–5. If no claim is established under Rule 10b–5, *a fortiori*, none would exist under section 17(a) of the 1933 Act.

16. The Court also declines to sustain the sufficiency of the complaint because the injury in this particular case (and thus the benefit of any recovery) was not incurred by anyone who was the subject of federal concern. In view of the unusual fact that the fraud was practiced not upon any member of the "decision-making body" of the corporation (*i. e.,*

officers, directors, or shareholders), *see* Globus, Inc. v. Jaroff, 266 F.Supp. 524, 529 (S.D.N.Y.1967); Simon v. New Haven Board & Carton Co., 250 F.Supp. 297, 299 (D.Conn.1966), but only upon creditors and policy holders, it is dubious whether plaintiff corporation was ever defrauded or deceived.

Doubtless, a corporation may be deceived or defrauded even if every member of the board of directors was fully informed of the true facts (or, in factual situations similar to this case, that all of the directors were participants in the scheme). Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. en banc, 1968); Continental Bank & Trust Co. v. Garfinkle, 292 F. Supp. 709 (S.D.N.Y.1968). But, as is

that, in the course of a scheme to loot a corporation of its assets, certain security transactions occurred, when these transactions—though contaminated by the overriding evil intent to accomplish the ultimate looting—did not involve fraud or deceit in connection with the sale or purchase of a security.

■ Manifestly, the sale of Manhattan's portfolio and the purchase of the Manhattan shares were necessary steps toward the ultimate looting of Manhattan's assets. But Rule 10b–5 requires the employment of fraud in connection with a security transaction, which is essentially different from the effectuation of a security transaction in connection with a fraudulent activity.[16a]

■ The complaint, taken as a whole, alleges no more than a common law action for misappropriation of corporate funds by a fiduciary, embezzlement or fraudulent conveyance perhaps, or the distribution of an illegal dividend. None of these actions, in the absence of diversity of citizenship, can be maintained in a federal court.

Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964) and Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir., en banc, 1968) do not hold otherwise. In *Ruckle*, the corporation proposed to issue its own shares to the president for a less than adequate consideration. A majority of the board withheld material information from one of the directors before approval was voted. The court held that the issuance would constitute a violation of Rule 10b–5.

In *Schoenbaum*, the court held that the issuance of stock by a corporation to its controlling stockholder at "vastly inadequate prices," apparently with each board member having full knowledge of the inadequacies (all were named as co-conspirators and defendants), stated a claim for relief under section 10(b) and Rule 10b–5.

The crucial facts in these cases were that, in each, the "fraudulent practice" was deception (whether of directors or shareholders) which directly resulted in the issuance of stock for inadequate consideration, thus creating the danger of the spread of "thin" or "watered" stock. The direct involvement of the deceit with a transaction of securities is fraud "in connection with" the sale of stock, and,

---

evident from Judge Hays' dissenting opinion in the three-judge panel decision in Schoenbaum v. Firstbrook, *supra* (Judge Hays, significantly, having also authored the *en banc* majority opinion reversing the three-judge panel's decision), in such a case, there must be a showing that the directors deceived the shareholders—"the real owners of the property with which the directors were dealing." 405 F.2d at 215.

The highly individualized circumstance present in the case at bar—the lack of injury to shareholders—intensifies the Court's reluctance to hold that the complaint states a claim of federal fraud.

16a. The distinction here drawn can be best illustrated by analogy to the general conspiracy statute, 18 U.S.C. § 371 (1964), which maks unlawful a conspiracy when one or more of the members of the conspiracy "do any act to effect the object of the conspiracy." In order for conduct to qualify as an overt act under that statute, the conduct need not, of itself, be unlawful, provided it was done to effect the object of the conspiracy. Nevertheless, unless the act done in furtherance of the conspiracy was itself unlawful, although committed for the purpose of furthering the object of the conspiracy, the overt act may not serve as the basis for a criminal prosecution for a substantive crime.

Similarly, in this case, the various security transactions were overt acts committed for the purpose of promoting and effecting the object of the fraudulent conspiracy (*e. g.*, the sale of Manhattan's portfolio of United States Government securities was necessary to effectuate the looting of Manhattan's assets). However, unless such security transactions were independently unlawful—*i. e.*, unless there was fraud in connection with the purchase or sale of a security—they could not serve as the basis for a substantive claim under section 10(b) and Rule 10b–5. As pleaded, the security transactions themselves, when considered from the viewpoint of section 10(b) and Rule 10b–5, were innocuous though constituting overt acts furthering the fraudulent scheme. Consequently, they cannot serve as the independent predicate for liability under section 10(b) and Rule 10b–5.

consequently constitutes federal fraud irrespective of whether it also constitutes corporate mismanagement. As the three-judge panel in *Schoenbaum v. Firstbrook, supra,* stated: "A fraud upon a corporation which has the effect of depriving it of fair compensation for the issuance of its stock would necessarily have the effect of reducing the equity of the corporation's shareholders and this reduction in equity would be reflected in lower prices bid for the shares on the domestic stock market." 405 F.2d at 208.

The facts in the instant case, on the contrary, could not give rise to any of these dangers and do not evidence that the fraud was rooted in a security transaction.

That the complaint in this case states no more than a non-federal common law cause of action becomes even more evident upon consideration of the factual situation and language of the Court of Appeals in *Mutual Shares Corp. v. Genesco, Inc.,* 384 F.2d 540 (2d Cir. 1967). Plaintiffs there alleged, inter alia, that defendant Genesco, a 94% stockholder in S. H. Kress & Co. had acquired its shares pursuant to a fraudulent conspiracy, the purpose of which was to finance its purchases of Kress stock from Kress' own assets and to manage Kress for Genesco's own benefit, appropriating Kress' assets in the meanwhile. After holding that plaintiffs could not maintain an action charging violations of Rule 10b–5 occurring before plaintiffs had acquired their shares, the court stated (as to the period subsequent to plaintiffs' acquisition of shareholder status) that the "fraudulent activities then alleged are primarily corporate abuse and diversion, claims cognizable under state law but not under the Act." 384 F.2d at 546. Only the claim that defendants had "manipulated the market price of Kress stock, keeping Kress dividends to a minimum, in order to force minority stockholders to sell out to Genesco at depressed values," *id.,* stated a good cause of action under Rule 10b–5.

The complaint in this case also fails to allege any actual or potential abuse of the trading process. Since public distribution of watered or valueless stock was not a part of the scheme, and the fraud had no potential manipulative effect on the market, and did not raise the spectre of any other evil which prompted passage of the securities acts or is a subject of federal concern, the factual situation in the instant case differs significantly from those in the cases plaintiff cites as major support for sustaining the validity of its claim.

*A. T. Brod & Co. v. Perlow, supra,* explicitly found that the fraud was federally cognizable because it had a "potentially manipulative effect on the securities market." 375 F.2d at 397.

*Hooper v. Mountain States Securities Corp.,* 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), is also stressed heavily by plaintiff. In that case, an individual named Cage was required to sever his connection with the plaintiff corporation (the nominal plaintiff was the corporation's trustee in bankruptcy) when a new group acquired control. Cage concocted a scheme whereby he induced the plaintiff's transfer agent to issue new shares with a market value of about $700,000 after transferring to the corporation worthless contract rights. The actual fraud appeared to be the false representations made to the transfer agent by certain former officers of the corporation and the phony corporate documents prepared to justify and legitimize the issuance of stock. The scheme also involved the distribution by Cage and his cohorts of this newly issued stock over security markets to unwary members of the investing public. Because the purpose and object of the scheme were to have valuable corporate stock issued to Cage (actually to another corporation controlled by Cage which was liquidated immediately after receiving the stock) in exchange for worthless consideration, and then to distribute the stock publicly, the

fraud was definitely "in connection with" the purchase and sale of securities. The scheme induced an unfair sale of securities and it had as a major purpose the spread of watered stock to many investors.

In Pettit v. The American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963), a similar scheme was perpetrated when huge amounts of Swan-Finch stock was issued, through various corporate shells, for worthless consideration, and then distributed over the American Stock Exchange. That court noted that the fraud violated Rule 10b–5 because the transaction represented an "abuse of the securities trading process," and because the "heart of this case are two fraudulent transactions in securities." 217 F. Supp. at 25–26.

Each security transaction herein was effected for full and fair consideration with full knowledge in both purchaser and seller as to the value of the securities sold. Where this has occurred Rule 10b–5 is not violated. *See* Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1166 (1965). Only where the security transaction was a "vital aspect of a continuing scheme," should the fact of subsequent misappropriation of the consideration result in a violation of Rule 10b–5. *Compare* Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y. 1964), *with* S.E.C. v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3, 36–39 (S.D.N.Y.1968).

The complaint in this case presents no more than a complicated scheme of common law fraud.[17]

Discovery herein has been extensive. The parties have not called to the Court's attention any facts which were not alleged in the complaint and which would, if leave to amend the complaint were granted, state a cause of action under the securities acts. Accordingly, the Court

hereby dismisses the complaint as to the movants and hereby directs that judgment be entered for movants. Fed.R. Civ.P. 54(b).

So ordered.

---

17. Plaintiff instituted such a common law action in New York County Supreme Court in 1965. After joinder of issue, further proceedings in the action were en-joined. The factual allegations of the complaint filed in the state court proceeding are essentially the same as those contained in the complaint herein.