Breitel, J.
These prosecutions arose out of the purchase of the capital Stock of Manhattan Casualty Company, a domestic insurer, paid for unlawfully with $5,000,000 of its own liquid assets. The crimes charged in the indictment, both in the substantive and conspiracy counts, related not to this unlawful use of Manhattan’s assets but to the alleged concealment of the true transaction by the issuance of, and manipulations with, various bank certificates of deposit. It was alleged that these certificates were securities owned by Manhattan, and had been pledged in violation of section 78 (subd. 2) of the Insurance Law.
Section 78 (subd. 2) provides in part: “ in no event shall any * * * pledge or transfer of [its] securities for a loan be made by such insurer if the insurer does not receive the proceeds of such loan ”.
*142 Defendants contend that a certificate of deposit is not a “ security ” under section 78 (subd. 2); that even if such certificates are securities under section 78 (subd. 2), the certificates involved were not Manhattan’s property; and that if they are treated as Manhattan’s property, then Manhattan received the loan proceeds. Defendants raise other issues which, in light of the view taken on the principal issues, do not require discussion.
The judgments of conviction should be reversed and the indictment dismissed. The certificates of deposit were not assets of Manhattan and, therefore, were not pledged in violation of section 78 (subd. 2) of the Insurance Law, as charged in counts 6 and 7. The counts charging forgery and misconduct of corporate officers are based on the failure to indicate that the certificates of deposit, as assets of Manhattan, had been pledged. Since the allegations and proof, as limited by the indictment and theory of the trial, established no violation of section 78 (subd. 2) of the Insurance Law or of the Penal Law,[1] the defendants are not guilty of the conspiracy charged to commit such crimes.
On January 24, 1962, Manhattan Casualty Company, wholly owned by Bankers Life and Casualty Company, was purchased by James P. Begole, a deceased defendant, for $5,000,000 from Bankers Life.
Defendant Sweeny had been president of Manhattan when, in December, 1961, he was relieved by Bankers Life following a dispute. After indications that Bankers Life desired to sell Manhattan, Sweeny learned that Begole and Standish T. Bourne, a Boston financier, President of New England Acceptance Corporation, and also a deceased defendant, were interested in purchasing Manhattan. Sweeny advised Bourne without participating in the negotiations. Begole, on January 19, 1962, signed an agreement to purchase Manhattan, for which Bourne was to arrange the financing.
Defendant Garvin, senior partner of Garvin, Bantel & Co., money brokers, arranged with the Irving Trust Company for the issuance of a $5,000,000 check, without disclosing the payee, to be covered by securities to be delivered later to Irving Trust. Garvin had evidently been brought into the matter by Bourne. On the morning of the closing on January 24th, Garvin tele *143 phoned Irving Trust and requested that one Gunter, an assistant secretary, issue the $5,000,000 check payable to the order of Bankers Life and bring it to Garvin’s office. At his office Garvin introduced Gunter to Bourne, Begole and Sweeny. Some of the group went to Manhattan’s offices for the closing. There, Gunter, through Sweeny, gave the check to the Bankers Life representative. In exchange Begole received an envelope containing Manhattan’s stock.
Thus far Irving Trust was not covered for its $5,000,000 advance. Immediately after the sale, Begole “convened” a stockholders ’ meeting at which directors were elected, including Begole and Sweeny. The new directors authorized the sale of Manhattan’s government bonds, and use of the proceeds to purchase a certificate of deposit. (The proceeds were never so used. If they had, there would be no question that the certificate of deposit was an asset of Manhattan.)
Later in the day, Irving Trust received Manhattan’s government bonds. The bonds were sold and the proceeds credited to Manhattan’s account, as Sweeny instructed, to reimburse Irving Trust for the $5,000,000 advance used to pay Bankers Life.
The effect of the transaction was that Manhattan’s stock had been purchased with proceeds from the sale of Manhattan’s government bonds. Begole now held Manhattan’s stock. Bankers Life had been paid for the stock with the Irving Trust check, Irving Trust’s check had been covered by the proceeds from the sale of the bonds, and Manhattan’s bond box was empty of the government bonds. That emptiness, and the deviation from the corporate resolution to use the bonds to purchase a certificate of deposit, had now to be concealed. For that there was a prior plan for a camouflage transaction.
Approximately two weeks before the January 24th closing, Bourne had arranged with Garvin to obtain a $5,000,000 certificate of deposit in favor of Manhattan. The certificate was to secure a $5,000,000 loan to New England Acceptance. Garvin made the necessary arrangements with Belgian American Bank and Trust Company (Belgian Trust), a commercial bank. The day before the closing, Garvin notified Belgian Trust that the $5,000,000 deposit would be made by an insurance company, and that a loan of equal amount would be made to New England Acceptance.
*144 At about 4:00 p.m. of the closing day, Garvin again telephoned Gunter and requested a second Irving Trust check for $5,000,000 payable to Belgian Trust. Garvin told Gunter that this was ‘ ‘ the second half of the transaction which originated in the morning ’ ’, and was merely ‘ ‘ a check swap ’ ’. The second Irving Trust check for $5,000,000 was issued immediately as requested, and delivered to the Belgian American offices where Sweeny gave this second check to Paul Sandrisser, a vice-president of both Belgian Trust and an affiliate. (Belgian Trust was affiliated and shared offices with Belgian American Banking Corporation [Belgian Banking], an investment company.)
Sandrisser, having received the second $5,000,000 Irving Trust check, then issued a $5,000,000 Belgian Trust certificate of deposit in favor of Manhattan. This certificate was indorsed by Sweeny and Katz, Manhattan’s Assistant Treasurer, “to the order of New England Acceptance Corp.” Belgian Banking, the affiliate of Belgian Trust, holding the certificate as collateral, then loaned $5,000,000 to New England Acceptance Corp., by check payable to New England Acceptance. Somehow, later, the payee was changed to “ Irving Trust Company New York for A/C of: New England Acceptance Co. Inc.” Bourne gave this Belgian Banking check to Irving Trust to reimburse it for the second $5,000,000 Irving Trust check payable to Belgian Trust.
This transaction was a complete wash or circular transaction, and its purpose was a camouflage. Irving Trust was fully repaid for its second check by the proceeds of a loan secured by a certificate of deposit of the very money advanced by Irving Trust. Its effect, and indeed its purpose, was to produce a trail of offsetting book entries among multiple entities and not to eventuate in any shift of principal assets. (The interest rates on the loan and certificate of deposit, with a spread of 1% per annum, were all that constituted a real financial change in the transaction. The sum of $25,000, 1% interest for six months, was the price for this side transaction which was otherwise completely offsetting.)
Five or six days later, on January 29 or 30, 1962, Irving Trust was instructed, by an unidentified person, to reverse the January 24 bookkeeping entries so as to make it appear that the first check to Bankers Life was drawn against the credit for the check received from Belgian Banking, and that the *145 second check, to Belgian Trust, used to purchase the certificate of deposit, was issued against the proceeds from the sale of Manhattan’s government bonds. (Had this reversed entry truly represented the events that had occurred, then Manhattan indeed would have been the owner of the certificate of deposit, and its pledge would have been unlawful.)
It is the People’s theory that on January 24, 1962, Manhattan owned the $5,000,000 certificate of deposit, although from inception it had been indorsed to New England and promptly pledged to secure the loan to New England, which, as detailed earlier, played no role in the purchase of Manhattan stock, but instead was used to base the series of offsetting entries to conceal the application of Manhattan’s government bonds to purchase its own capital stock.
That ends the first chapter of the financial and bookkeeping maneuvers.
On July 24, 1962, the Belgian Trust certificate of deposit would mature, the loan to New England would become due, and a further series of manipulations was required.
Just before the July due date, Garvin telephoned Belgian Banking to request that its loan to New England be renewed. He requested that Belgian Banking accept Manhattan’s stock as primary collateral and hold the renewed Belgian Trust certificate of deposit as secondary collateral. Belgian Banking agreed and on July 24, 1962 Belgian Trust issued a new nonnegotiable certificate of deposit in favor of Manhattan. Belgian Banking then received a new promissory note from New England Acceptance, dated July 24,1962, and signed by Bourne, in which it was recited that Manhattan’s stock and the new certificate of deposit “in favor of Manhattan Casualty Co.” had been deposited as collateral security with Belgian Banking.
Belgian Banking also received two letters from Begole on July 24; one, a guarantee referring only to the Manhattan stock, which, according to Sandrisser, was rejected; and the other, a letter, considered by Sandrisser to be a pledge of the new certificate of deposit, stating in stilted language that the New England loan was secured by the Manhattan stock and ‘‘in addition to but not concurrently thereto, by an assignment ’ ’ of the certificate of deposit.
*146 The effect and purpose of these manipulations were simply to renew the offsetting entries, concealing the earlier abstraction of the government bonds from Manhattan’s bond box.
Interestingly, but of no substantial effect, in August, 1962, during the annual examination of the Belgian American affiliates, the State Banking Examiner “ criticized ” Belgian Banking for holding as collateral the nonnegotiable July 24, 1962 certificate of deposit and suggested that the certificate be made negotiable. Consequently, Belgian Trust issued, in Manhattan’s name, a new certificate backdated to July 24, 1962 and in negotiable form. This certificate, indorsed in blank by Sweeny and Begole, was retained by Belgian Banking.
A third series of financial manipulations occurred as the new double maturity date of the outstanding loan and certificate of deposit approached.
On January 20, 1963, .four days before the loan to New England Acceptance became due, Bourne requested that Garvin deposit $5,500,000 in Irving Trust for the issuance of “certificates [of deposit] for the account of Manhattan Casualty Company”. Five certificates in bearer form were issued on January 24, 1963 by Irving Trust and delivered to the Marine Midland Bank as collateral for a loan made to the account of Garvin, Bantel & Co. The proceeds of this loan were used to purchase the certificates. The counterfoils or carbon copies of these certificates contained, typed in parentheses, the name “Manhattan Casualty Co.”. Marine Midland held the certificates for one day. Garvin, Bantel had a ‘‘ continuing loan agreement ’ ’ with Marine Midland and the $5,500,000 ‘ ‘ advance ’ ’ was paid on the next day with funds from an apparently unrelated transaction. Marine Midland then released the certificates and, pursuant to Garvin, Bantel’s instruction, forwarded them to a North Carolina bank to which they had been traded in the secondary money market.
On January 25,1963 Garvin requested that Irving Trust issue a check to “ close out ” the Belgian Trust certificate of deposit. Irving Trust issued a check to Belgian Banking which was credited to satisfy the loan to New England Acceptance. Payment of this loan released the Belgian Trust certificate of deposit and the funds were paid back to Irving Trust.
*147 On May 15, 1963 Irving Trust falsely certified to the Insurance Department that these certificates were on deposit at Irving Trust for Manhattan’s account and were unencumbered.
In fact, the January, 1963 transactions were also a complete wash, moving no assets of Manhattan, but leaving a trial of offsetting book entries and commercial paper. It is, however, the People’s theory (count 7) that the January, 1963 certificates of deposit, when purchased from Irving Trust and pledged as collateral with Marine Midland, were assets of Manhattan.
A few months later the Superintendent of Insurance examined Manhattan’s records and asked to inspect the Irving Trust certificates of deposit. Manhattan could not produce them and the company was put into receivership. The abstraction from Manhattan’s bond box was now revealed.
During the period of these transactions there was omitted from Manhattan’s general ledger, for the years 1962 and 1963, any indication that the various certificates of deposit, although listed as assets, had been indorsed to New England or pledged as collateral for the several loans, which in turn had produced the funds to obtain the certificates. Similarly, the quarterly statements (June 30 and September 30, 1962) and the 1962 annual statement, made to the Superintendent of Insurance, listed the certificates as assets without indicating that they had been pledged. There is no question that by these means Manhattan’s assets were grossly inflated, but the indictment is not based on such inflation. Instead, it is based on the unlawful pledging of assets which in fact were never owned by Manhattan.
The key to the analysis is that the Manhattan stock was paid for with Manhattan’s government bonds. This was always a separable and separate transaction. It occurred on the morning of January 24, 1962. On the afternoon of that day, and after the stock sale had been consummated, and on two subsequent occasions when loans matured, there were the complex offsetting loans, and deposits of the loan proceeds were made to procure certificates of deposit to secure the same loans. This camouflage obscured the abstraction of the government bonds. The issue is whether the camouflage gave rise to any new or substituted assets of Manhattan which were unlawfully pledged.
As noted, the January, 1962 certificate of deposit was pur *148 chased with the proceeds of the loan to New England. The July, 1962 certificate of deposit was merely a reissue of the earlier one. And the January, 1963 certificates were purchased with the use of Garvin, Bantel’s own line of credit. These loans and certificates (whatever names appeared as payees on the certificates) were interlocked, and passed no assets ultimately to anyone, least of all for even a transient moment to Manhattan. These transactions, now time-barred, were simply a cover-up of a misappropriation of Manhattan’s assets in January, 1962.[2] The cover-up has been successful because, unfortunately, the indictment rests on a mistaken premise.
Defendants correctly argue that the certificates were never assets of Manhattan. They point to the characterization of the transaction, in a related Federal civil action, as a “wash” transaction, which ‘‘had no economic reality.’’ As the Federal court stated, Manhattan “ merely participated] as a conduit for the sole purpose of having its name appear as payee which enabled the fraud to become further camouflaged.” (Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co., 300 F. Supp. 1083, 1099 [Herlands, J.].) It was considered controlling that “ [n] either Manhattan’s portfolio nor the proceeds thereof was the immediate consideration for the issuance ” of the January, 1962 Belgian Trust certificates. And the Federal court noted that the Irving Trust certificates had been paid for by the Marine Midland loan to Garvin, Bantel & Co., an arrangement in which only Marine Midland and Garvin, were parties, ‘ ‘ although Manhattan was the payee of certificate ” (id.).
Nor is the issue resolvable on any assertion of estoppel or equitable ownership in favor of Manhattan. The rule, to the extent that there is one, is available undoubtedly in civil actions upon a showing of false representation or other fraud and detrimental reliance. But it is not possible to transpose the rule to the facts of this case. Even if estoppel doctrine be applicable in a criminal action, no detrimental reliance has been shown: either that Manhattan irrevocably changed its position in reliance on the defendants’ representations, or that the delay in *149 discovery further eroded Manhattan’s financial position. What the present record really shows is that defendants contrived to conceal the original 1962 misappropriation by false entries and the like. That may involve a number of crimes, but none that were charged in this indictment. Instead, the indictment in this case, including the forgery, false report, and conspiracy counts, depends upon the misrepresentation of the pledging of Manhattan’s assets, an event that never occurred.
Section 78 (subd. 2) of the Insurance Law requires that the assets pledged be those of the insurer. It is conceded that the crime of forgery in the third degree (former Penal Law, § 889—4 counts) and the crime of misconduct of a corporate officer (former Penal Law, § 665, subd. 3 — 3 counts), also based on these “ assets ”, stand only if the certificates of deposit were assets of Manhattan. The conspiracy to commit the above crimes must also fall with the substantive counts.
Accordingly, the judgments should be reversed and the indictment dismissed.
Chief Judge Fuld and Judges Scileppi, Bergan, Jasen and Gibson concur; Judge Burke taking no part.
Judgments reversed, etc.

. References to Penal Law are to the former Penal Law, repealed L. 1965, ch. 1030, eff. Sept. 1, 1967.

. The camouflage transactions of January 24, 1962 were never made the subject of the present indictment, because like the 1962 abstraction of Manhattan’s government bonds, they too were time-barred.