**Nicholas JANNES et al., Plaintiffs-Appellants,**

v.

**MICROWAVE COMMUNICATIONS, INC., et al., Defendants-Appellees.**

**No. 71–1369.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1972.

Decided May 1, 1972.

Rehearing Denied May 24, 1972.

Tasso H. Coin, Donald C. Nord, Charles A. Bane, Donald J. McLachlan, Chicago, Ill., for plaintiffs-appellants; Isham, Lincoln & Beale, Chicago, Ill., of counsel.

Reuben L. Hedlund, Alan I. Becker, Francis J. Higgins, Clarold L. Britton, Jay Erens, John P. Scotellaro, Chicago, Ill., for defendants-appellees; Jenner & Block, Levy & Erens, Kirkland, Ellis, Hodson, Chaffetz & Masters, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., of counsel.

Before KILEY, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

We are required to evaluate the effect of Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), upon the earlier dismissal of this Rule 10b–5 case, which was pending here on appeal when *Bankers Life* was announced by the Supreme Court.

The plaintiffs, shareholders of Microwave Communications, Inc., an Illinois corporation ("MCI"), brought a derivative action on behalf of the corporation for damage allegedly sustained by it as a result of charged violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5).

The original complaint was filed on October 31, 1969. Motions by the defendants to dismiss the complaint or quash summons were briefed by the defendants. The plaintiffs responded by seeking leave to file an amended complaint. Leave was granted and the amended complaint was filed on April 1, 1970. An additional attorney then filed his appearance for the plaintiffs.

The defendants renewed their motions to dismiss and quash, and again filed briefs in support. Instead of filing answering briefs, the plaintiffs filed motions for a temporary restraining order and for a preliminary injunction, which were denied on June 11, 1970. In the order of denial, the district court expressed doubts as to whether the amended complaint charged violations of section 10(b). A second additional attorney then filed his appearance for the plaintiffs. On July 13, 1970, the court granted the plaintiffs leave to file a second amended complaint, over defendants' objections.

The defendants again renewed their motions to dismiss and all parties filed briefs. On January 8, 1971, 325 F.Supp. 896, the district court dismissed the second amended complaint as violating Fed.R.Civ.P. 8(a), which requires a short, plain statement of claim, and dismissed the cause of action.

At that point three additional attorneys filed their appearance for the plaintiffs. Thereafter, the plaintiff moved the district court to vacate the dismissal of the action and to grant leave to file another amended complaint. The plaintiffs tendered a third amended complaint ten days later. On March 5, 1971, 325 F.Supp. 898, the district court denied the plaintiffs' motions to vacate the dismissal and for leave to file the third amended complaint.

According to the second amended complaint, MCI was incorporated in 1963 for the purpose of acting as a common carrier of microwave channels between various major cities. In December, 1963, MCI filed its initial application with the Federal Communications Commission to serve the area between Chicago and St. Louis. The microwave concept constituted a new type of communication system; no application of this kind had ever been granted by the F.C.C.

A hearing examiner of the F.C.C. ruled in favor of granting a license to MCI in July, 1967. When the ruling was affirmed by the full commission in August, 1969, MCI became the first licensee in the United States to be granted a construction permit for a microwave communications system.

Microwave Communications of America, Inc. ("Mi-Com") was incorporated in Delaware on August 8, 1968. Defendant McGowan was the controlling shareholder and chairman. Defendant Goeken was the president and a director of both MCI and Mi-Com.

Sometime after the granting of the F.C.C. license to MCI, Goeken and defendant Hermes, another MCI officer and director, allegedly misrepresented to the other MCI directors that MCI was unable to procure the financing necessary for development and that McGowan and Mi-Com were the sole source of financing available to MCI. As a result, valuable assets and corporate opportunities were sold by MCI to Mi-Com for 25 percent of the common stock of Mi-Com. Plaintiffs alleged that this exchange was inadequate, because, as Mi-Com had no other assets, MCI in effect received back the value of 25 percent of its assets for the transfer of 100 percent of its assets. At the same time MCI sold 69 shares of common stock to McGowan at $700 a share.

The second amended complaint further alleged that, by misrepresenting facts to the other MCI shareholders, the individual defendants acquired additional shares of MCI stock at a price below its value. It further alleged that Goeken and Hermes used their talents and special knowledge acquired as fiduciaries of MCI to develop the assets of Mi-Com and of a partially-owned subsidiary of Mi-Com, MCI New York West, Inc., a Delaware corporation ("N. Y. West").

These facts were alleged somewhat vaguely, laboriously and haphazardly in the second amended complaint, but they are alleged. The third amended complaint was clearer and more direct. It alleged manipulative and deceptive transactions by McGowan, Goeken and Hermes, by which financing for MCI was suppressed, Mi-Com was formed, and substantially all of MCI's assets, excluding only the Chicago-St. Louis microwave route, were transferred to Mi-Com for a grossly inadequate consideration of 25 percent of Mi-Com's stock. The sale of 69 shares of MCI stock to McGowan for approximately $48,000 is alleged to have been entered into for the purpose of giving "color to the defendants' fraudulent scheme of legitimizing the false representations that financing for MCI was available only through McGowan."

Both complaints alleged looting of the assets and corporate opportunities of MCI through breach of fiduciary duties, self-dealing and corporate mismanagement.

The district court, in refusing to grant leave to the plaintiffs to file their third amended complaint, noted that it "strains to infuse federal jurisdiction into matters primarily consisting of alleged breach of fiduciary duties, self-dealing, and corporate looting accomplished by means of a conspiracy to deprive MCI of its assets and opportunities." The court concluded, "Claims of corporate mismanagement or breach of fiduciary duties are not actionable per se under Section 10(b) and Rule 10b–5," citing O'Neill v. Maytag, 339 F.2d 764, 767–768 (2d Cir. 1964). Finally, the court quoted from the district court opinion in Superintendent of Insurance v. Bankers Life and Casualty Co., 300 F.Supp. 1083 (S.D.N.Y.1969), to the effect that looting a corporation of its assets did not state a federal claim when the transactions did not involve fraud or deceit in connection with the sale or purchase of a security.

At that time, the *Bankers Life* case had been affirmed by the Court of Appeals for the Second Circuit in 430 F.2d 355 (2d Cir. 1970). But, more than eight months after the district court's final order and memorandum in the present case, the Supreme Court of the United States reversed that case. Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S. Ct. 165, 30 L.Ed.2d 128 (1971).

Bankers Life had agreed to sell all the stock of Manhattan Casualty Company to one Begole for $5,000,000. Begole and others arranged through a note brokerage firm to obtain a $5,000,000 check from Irving Trust Company, although they had no funds on deposit there. They used the check to buy the stock and promptly installed their own directors and officers at Manhattan. Manhattan then sold $4,854,552.67 in United States Treasury bonds and credited the proceeds plus cash to total $5,000,000 to a Manhattan account at Irving, where the earlier check was charged against it.

The transactions were actually much more complex, but the result was that Begole owned all the Manhattan stock, having used $5,000,000 of Manhattan assets to buy it.

The district court had dismissed the *Bankers Life* case primarily upon the authority of the *Birnbaum* case. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), held simply that, under the circumstances of that case, controlling shareholders were not liable to their corporation in a derivative suit for selling their control shares at a premium above the market price. The relatively short opinion by Judge Augustus Hand established two durable principles interpreting the last crucial phrase of Rule 10b–5, "in connection with the purchase or sale of any security." The first, a procedural guideline, was a standing-to-sue requirement that only defrauded purchasers or sellers could bring suit under the rule. The second, which went to the substantive basis for stating a claim for federal relief, was that section 10(b) and the rule were "directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs." 193 F.2d at 464. In other words, *Birnbaum*, in interpreting the words "in connection," required a fairly direct nexus between the alleged fraud and the purchase or sale of a security.

The district court in *Bankers Life* held that the superintendent of insurance as liquidator of Manhattan had standing to maintain an action regarding the sale of Manhattan's portfolio of United States bonds. But the fraud, although "a complicated scheme of common law fraud" and "a scheme to loot a corporation of its assets," was not a "federal fraud" because of its lack of effect on the public interest in maintaining free and open securities markets.[1]

1. The district court's opinion is capsulized in its observation that "Rule 10b–5 requires the employment of fraud in connection with a security transaction, which is essentially different from the effectuation of a security transaction in connection with a fraudulent activity." 300 F.Supp. at 1102. The district court

In affirming, the court of appeals held that the fraud alleged "in no way affected either the securities market or the investing public. No stockholders were defrauded, no investor injured. The purity of the security transaction and the purity of the trading process were unsullied." 430 F.2d at 361. The court also quoted *Birnbaum* in stating, "Rule 10b–5 was not intended to provide a remedy for schemes amounting to no more than 'fraudulent mismanagement of corporate affairs.'" 430 F.2d at 360.

In reversing the lower courts, Mr. Justice Douglas, speaking for the unanimous Supreme Court, held that a cause of action respecting the sale by Manhattan of its Treasury bonds had been charged under section 10(b). He said (404 U.S. at 10–13, 92 S.Ct. at 168):

> "The Act protects corporations as well as invididuals who are sellers of a security.
>
> \* \* \* \* \* \*
>
> "The fact that the fraud was perpetrated by an officer of Manhattan and his outside collaborators is irrelevant to our problem. For § 10(b) bans the use of any deceptive device in the 'sale' of any security by 'any person.' . . . Likewise irrelevant is the fact that the proceeds of the sale that were due the seller were misappropriated.
>
> \* \* \* \* \* \*
>
> "The Congress made clear that 'disregard of trust relationships by those whom the law should regard as fiduciaries, are all a single seamless web' along with manipulation, investor's ignorance, and the like. . . . Hence we do not read § 10(b) as narrowly as the Court of Appeals; it is not 'limited to preserving the integrity of the securities markets,' \* \* \* \* though that purpose is included. Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b), whatever might be available as a remedy under state law.

> "We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. But we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face-to-face.
>
> \* \* \* \* \* \*
>
> "The crux of the present case is that Manhattan suffered an injury as a result of deceptive practices touching its sale of securities as an investor."

In the present case the complaint alleged that MCI suffered an injury as a result of deceptive practices touching its purchase of securities when it received only 25 percent of the Mi-Com stock for its valuable assets.[2] There is also the claim that MCI issued its own shares to controlling shareholders for less than adequate consideration. Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968), cert. denied, Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

Neither counsel for the plaintiffs in struggling to state a federal claim nor the district court in failing to find a federal claim could anticipate that the

---

was also influenced by the fact that "the fraud was practiced not upon any member of the 'decision-making body' of the corporation (*i. e.*, officers, directors, or shareholders), : . . but only upon creditors and policy holders." 300 F. Supp. 1101 n. 16.

2. In *Bankers Life*, the Supreme Court quoted Hooper v. Mountain States Securities Corp., 282 F.2d 195, 203 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961): "Considering the purpose of this legislation, it would be unrealistic to say that a corporation having the capacity to acquire $700,000 worth of assets for its 700,000 shares of stock has suffered no loss if what it gave up was $700,000 but what it got was zero." 404 U.S. at 11, 92 S.Ct. at 168.

Supreme Court would effect a change in the *Birnbaum* [3] principles.

But that decision compels us to reverse the district court judgment for the reason that under *Bankers Life* the second amended complaint stated a federal claim. Since the third amended complaint stated it more artfully, however, we remand with directions that plaintiffs be granted leave to file the third amended complaint.[4]

---

3. In Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972), the court of appeals had affirmed the dismissal of a *Birnbaum*-type case. But on rehearing *en banc* after reversal of the *Bankers Life* case by the Supreme Court, the court held that the dismissal was error.

4. The defendants also contend that the verification of the third amended complaint is defective in that one of the plaintiffs stated "that he has had a detailed investigation made of the facts alleged therein, and that said facts are true or that on the basis of this investigation he is informed and has reasonable grounds to believe that they are true." We find this verification adequate in view of Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 373, 86 S.Ct. 845, 851, 15 L.Ed.2d 807 (1966): "We cannot construe Rule 23 or any other one of the Federal Rules as compelling courts to summarily dismiss, without any answer or argument at all, cases like this where grave charges of fraud are shown by the record to be based on reasonable beliefs growing out of careful investigation."