**UNITED STATES of America, Appellee,**

v.

**David CARPENTER, Kenneth P. Felis, and R. Foster Winans, Defendants-Appellants.**

**Nos. 546, 524 and 525, Dockets 85–1312, 85–1313 and 85–1314.**

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1985.

Decided May 27, 1986.

Jed S. Rakoff, New York City (Howard W. Goldstein, James Niss, Mudge Rose Guthrie Alexander & Ferdon, New York City, of counsel), for appellant David Carpenter.

E. Michael Bradley, New York City (I. Scott Bieler, Brown, Wood, Ivey, Mitchell & Petty, New York City, of counsel), for appellant Kenneth P. Felis.

Don D. Buchwald, New York City (Buchwald & Kaufman, New York City, of counsel), for appellant R. Foster Winans.

Peter J. Romatowski, Asst. U.S. Atty., New York City (William M. Tendy, Acting U.S. Atty., for Southern Dist. of N.Y., Charles M. Carberry, Stuart E. Abrams, Asst. U.S. Attys., New York City, of counsel), for appellee U.S. of America.

Daniel L. Goelzer, Jacob H. Stillman, Esq., Rosalind C. Cohen, Richard A. Levine (Paul Gonson, of counsel), on the brief for Securities and Exchange Comm'n, Washington, D.C., as amicus curiae.

Benjamin W. Heineman, Jr., Carter G. Phillips, and Mark D. Hopson (Sidley & Austin, Washington, D.C., of counsel), on the brief for Reporters' Committee for Freedom of the Press, the Nat. Ass'n of Broadcasters, the N.Y. Financial Writers Ass'n, the Media Institute, the Newspaper Guild, the Radio-Television News Directors Ass'n, American Society of Magazine Editors, Nat. Newspaper Ass'n, and Associated Press Managing Editors, as amici curiae in support of defendants-appellants.

Before MANSFIELD, PIERCE and MINER, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from judgments of conviction in the United States District Court for the Southern District of New York, Charles E. Stewart, Jr., *Judge,* entered after a twenty-day non-jury trial, following which Winans and Felis were found guilty of securities fraud by misappropriating material, nonpublic information from the *Wall Street Journal ("Journal")* in connection with the purchase and sale of securities, and of mail and wire fraud. Winans and Felis were also convicted of conspiracy to commit such securities and mail and wire frauds and to obstruct justice. Carpenter was convicted of aiding and abetting in the commission of securities fraud and mail and wire fraud. *United States v. Winans, et al.,* 612 F.Supp. 827 (S.D.N.Y.1985).

Appellants contend, *inter alia,* that they may not be held criminally liable for violating, or conspiring to violate or aiding and abetting in violating, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, because they were not corporate insiders or "quasi-insiders" and did not misappropriate

material nonpublic information from such insiders or "quasi-insiders."

We hold that section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 proscribe an employee's unlawful misappropriation from his employer, a financial newspaper, of material nonpublic information in the form of the newspaper's forthcoming publication schedule, in connection with a scheme to purchase and sell securities to be analyzed or otherwise discussed in future columns in that newspaper, and that the use of the newspaper's interstate wire and mail production and distribution channels for purposes of effectuating said scheme may serve as a predicate for criminal liability for mail and wire fraud. We therefore affirm the convictions based on these substantive counts. We also affirm the district court's conviction of defendants Winans and Felis of conspiracy and of defendant Carpenter of aiding and abetting. However, we reverse Winans' conviction of conspiracy to the extent that it is based upon certain trades made between Felis and a third party, named Stephen Spratt, since these transactions were not within the scope of the unlawful agreement to trade on the misappropriated information.

Affirmed in part and reversed in part.

## BACKGROUND

Defendants Kenneth P. Felis ("Felis"), and R. Foster Winans ("Winans") appeal from judgments of conviction for federal securities fraud in violation of section 10(b) of the 1934 Act and Rule 10b–5; mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343, all in connection with certain securities trades conducted on the basis of material, nonpublic information regarding the subject securities contained in certain articles to be published in the *Wall Street Journal.* Winans and Felis also appeal from judgments of conviction for conspiracy to commit securities fraud and mail and wire

fraud and to obstruct justice, in violation of 18 U.S.C. § 371, and David Carpenter ("Carpenter") appeals from a judgment of conviction for aiding and abetting.

Since March 1981, Winans was a *Wall Street Journal* reporter and one of the writers of the "Heard on the Street" column (the "Heard" column), a widely read and influential column in the *Journal.* Carpenter worked as a news clerk at the *Journal* from December 1981 through May 1983. Felis, who was a stockbroker at the brokerage house of Kidder Peabody, had been brought to that firm by another Kidder Peabody stockbroker, Peter Brant ("Brant"), Felis' longtime friend who later became the government's key witness in this case.

Since February 2, 1981, it was the practice of Dow Jones, the parent company of the *Wall Street Journal,* to distribute to all new employees "The Insider Story," a forty-page manual with seven pages devoted to the company's conflicts of interest policy. The district judge found that both Winans and Carpenter knew that company policy deemed all news material gleaned by an employee during the course of employment to be company property and that company policy required employees to treat nonpublic information learned on the job as confidential.[1]

Notwithstanding company policy, Winans participated in a scheme with Brant and later Felis and Carpenter in which Winans agreed to provide the two stockbrokers (Brant and Felis) with securities-related information that was scheduled to appear in "Heard" columns; based on this advance information the two brokers would buy or sell the subject securities. Carpenter, who was involved in a private, personal, non-business relationship with Winans, served primarily as a messenger between the conspirators. Trading accounts were established in the names of Felis, Carpenter, Winans, Brant, David Clark, Western

---

1. The district court found that whether confidentiality constituted a company "policy" or "practice" is a distinction without merit. Rather, it found significant that Winans had actual knowledge of the policy and that Carpenter was aware generally of the policy. 612 F.Supp. at 831.

Hemisphere, and Stephen Spratt.[2] During 1983 and early 1984, defendants made pre-publication trades on the basis of their advance knowledge of approximately twenty-seven *Wall Street Journal* "Heard" columns, although not all of those columns were written by Winans. Generally, Winans would inform Brant of the subject of an article the day before its scheduled publication. Winans usually made his calls to Brant from a pay phone, and often used a fictitious name. The net profits from the scheme approached $690,000. The district court found that this scheme did not affect the subject matter or quality of Winans's columns, since "[m]aintaining the journalistic purity of the column was actually consistent with the goals of the conspirators," given that the predictability of the columns' market impact depended in large part on the perceived quality and integrity of the columns. 612 F.Supp. at 835 n. 4.

In November 1983, when Kidder Peabody's Compliance Department noticed a correlation between "Heard" articles and trading in the Felis and Clark accounts, Felis was questioned by a Kidder Peabody supervisor. Felis denied any impropriety. However, he and Brant moved certain funds among accounts to conceal the continued operation of the scheme. Indeed, Felis had previously advised his friend, Stephen Spratt, to whom he had provided advance information on four occasions, to change the names on certain accounts so as to avoid being discovered. When the SEC began inquiring into the scheme, Clark and Brant both made misstatements to agency officials, and Carpenter produced false invoices that apparently had been designed to

conceal the truth from the SEC. Later, on March 29, 1984, Winans and Carpenter voluntarily testified fully at the SEC about this and about the scheme.

## DISCUSSION

The fairness and integrity of conduct within the securities markets is a concern of utmost significance for the proper functioning of our securities laws. In broadly proscribing "deceptive" practices in connection with the purchase or sale of securities pursuant to section 10(b) of the Securities Exchange Act of 1934, Congress left to the courts the difficult task of interpreting legislatively defined but broadly stated principles insofar as they apply in particular cases. This case requires us to decide principally whether a newspaper reporter, a former newspaper clerk, and a stockbroker, acting in concert, criminally violated or conspired to violate or aided and abetted in the violation of federal securities laws by misappropriating material, nonpublic information in the form of the timing and content of the *Wall Street Journal's* confidential schedule of columns of acknowledged influence in the securities market, in contravention of the established policy of the newspaper, for their own profit in connection with the purchase and sale of securities.

### I.

Although the facts render the securities fraud issue herein one of first impression, we do not write on a clean slate in assessing whether this case falls within the purview of the "misappropriation" theory of section 10(b) and Rule 10b–5 thereunder.[3]

---

**2.** David Clark refers to one of Brant's clients. Stephen Spratt refers to a friend of Felis. Western Hemisphere was the name on a Swiss bank account that Felis and Winans used after Kidder Peabody's Compliance Department became suspicious that Felis had pre-publication knowledge regarding certain "Heard" columns.

**3.** Section 10(b), 15 U.S.C. § 78j(b), prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...."

Rule 10b–5, 17 C.F.R. § 240.10b–5, states:
It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

In 1980, the Supreme Court left open the question of the viability of that theory, *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), with the concurring and dissenting opinions suggesting that had the theory been presented to the jury, Chiarella's conviction might have been affirmed.[4] Since then, the theory has been applied twice by this court. *See SEC v. Materia,* 745 F.2d 197 (2d Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *United States v. Newman,* 664 F.2d 12 (2d Cir.1981), *aff'd after remand,* 722 F.2d 729 (2d Cir.), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). It is clear that defendant Winans, as an employee of the *Wall Street Journal,* breached a duty of confidentiality to his employer by misappropriating from the *Journal* confidential prepublication information, regarding the tim-

ing and content of certain newspaper columns, about which he learned in the course of his employment.[5] We are presented with the question of whether that unlawful conduct may serve as the predicate for the securities fraud charges herein.

The core of appellants' argument is that *Newman* and *Materia* are inapposite because in those cases the information was misappropriated by employees who owed a duty of confidentiality not only to their employers, but also to their employers' clients, the corporations whose securities were traded. In other words, appellants argue, the misappropriation theory may be applied only where the information is misappropriated by corporate insiders or so-called quasi-insiders, *Dirks v. SEC,* 463 U.S. 646, 655 n. 14, 103 S.Ct. 3255, 3262 n. 14, 77 L.Ed.2d 911 (1983), who owe to the corporation and its shareholders a fiduciary

---

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**4.** In Chief Justice Burger's view, the employee's conviction should have been affirmed because "the evidence shows beyond all doubt that Chiarella, working literally in the shadows of the warning signs [stating employer's confidentiality policy] in the printshop misappropriated—stole, to put it bluntly—nonpublic information entrusted to him in the utmost confidence." *Chiarella,* 445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting). Justice Brennan, while disagreeing with the Chief Justice's view of the evidence, agreed that "a person violates § 10(b) whenever he improperly obtains or converts to his own benefit nonpublic information which he then uses in connection with the purchase or sale of securities." *Id.* at 239, 100 S.Ct. at 1120 (Brennan, J., concurring). Justice Blackmun, with whom Justice Marshall joined, wrote more broadly that even without resting Chiarella's conviction on a "misappropriation" theory, it was enough that the employee "purloined," *id.* at 246, 100 S.Ct. at 1124 (Blackmun, J., dissenting), information to which he had unique access by virtue of his position and the trust that attached to that position, *id.* at 246–52, 100 S.Ct. at 1123–27 (Blackmun, J., dissenting). Justice Stevens, while concurring in the opinion of the Court, wrote separately "to emphasize the fact that we have not necessarily placed any stamp of approval on what this petitioner did, nor have we held that similar actions must be considered lawful in the future." *Id.* at 238, 100

S.Ct. at 1120 (Stevens, J., concurring). Further, wrote Justice Stevens, the Court manifestly left open the question of whether the conviction could have been affirmed on grounds of misappropriation since that theory had not been presented to the jury.

We also note that the Court recently reiterated that tippee liability under section 10(b) may arise not only from participation in an insider's breach of fiduciary duty, but also where a tippee "otherwise 'misappropriate[s] or illegally obtains[s] the information.'" *Eichler v. Berner,* —— U.S. ——, 105 S.Ct. 2622, 2630 & n. 22, 86 L.Ed.2d 215 (1985) (quoting *Dirks v. SEC,* 463 U.S. 646, 665, 103 S.Ct. 3255, 3267, 77 L.Ed.2d 911 (1983); citing H. Rep. No. 98–355 at 14–15 (1983), *reprinted in* [1984] U.S. Code Cong. & Ad. News 2274).

**5.** *See, e.g.,* Rest. Agency 2d § 395, which provides:

Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.

The general tort of breach of a duty of confidentiality to an employer is, of course, well-settled. *See, e.g., Franke v. Wiltschek,* 209 F.2d 493, 495 (2d Cir.1953) (citing authority).

duty of abstention or disclosure. Thus, appellants would have us hold that it was not enough that Winans breached a duty of confidentiality to his employer, the *Wall Street Journal*, in misappropriating and trading on material nonpublic information; he would have to have breached a duty to the corporations or shareholders thereof whose stock they purchased or sold on the basis of that information.

Appellants read *Newman* and *Materia* and interpret the misappropriation theory too narrowly. Notwithstanding the existence of corporate clients of the employers in *Newman* and *Materia,* the misappropriation theory more broadly proscribes the conversion by "insiders" *or others* of material non-public information in connection with the purchase or sale of securities. *See Materia,* 745 F.2d at 203 (liability may arise merely because one "misappropriates non-public information in breach of a fiduciary duty and trades on that information to his advantage"); *id.* at 201 (section 10(b) was not "aimed solely at the eradication of fraudulent trading by corporate insiders"); *cf. Newman,* 664 F.2d at 17 ("the language of Rule 10b–5 … contains no specific requirement that fraud be perpetrated upon the seller or buyer of securities"); *SEC v. Musella,* 578 F.Supp. 425, 438 (S.D.N.Y. 1984) (*Newman* "gave legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair, and that distinctions premised on the source of the information undermine the prophylactic intent of the securities laws"). It is precisely such conversion that serves as the predicate for the convictions herein.

Although *Dirks* disapproved of certain trading by insiders or quasi-insiders who owe a fiduciary duty to investors, courts are not thereby constrained from recognizing other misconduct. To give *Dirks* such preclusive effect would suggest that one application of a statute cannot admit of another application not raised in the first case. As the district court correctly stated, "[i]t is not accurate to say that *Dirks* wrote the book on insider or outsider trading; it wrote one chapter with respect to one type

of fraudulent trading." 612 F.Supp. at 842. Indeed, the chapter that *Dirks* wrote derives from prior jurisprudence in which "fine distinctions and rigid classifications" were appropriately foresaken to facilitate the recognition of significant doctrinal reasons for holding members of particular, even if new, groups liable. *See In Re Cady, Roberts & Co.,* 40 S.E.C. 907, 911 (1961) (liability not restricted to "traditional" insiders such as officers, directors and controlling stockholders), *cited approvingly in Dirks,* 463 U.S. at 653, 103 S.Ct. at 3260. Given the broad remedial purposes of the securities laws, the Supreme Court has "repeatedly recognized that securities laws combatting fraud should be construed 'not technically and restrictively but flexibly,' " *Herman & MacLean v. Huddleston,* 459 U.S. 375, 386–87, 103 S.Ct. 683, 689–90, 74 L.Ed.2d 548 (1983) (quoting *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)). Other cases involving the misappropriation theory have distinguished *Dirks* substantially for the reasons stated in the district court opinion. *SEC v. Materia,* [1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶¶ 99,526, 99,543 (S.D.N.Y.1983), *aff'd,* 745 F.2d 197 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *SEC v. Musella,* 578 F.Supp. at 437–43; *United States v. Reed,* 601 F.Supp. 685, 699–703 (S.D.N.Y.1985), *rev'd in part,* 773 F.2d 477 (2d Cir.1985) (reinstating perjury and obstruction counts).

Further, we think that the application of the misappropriation theory herein promotes the purposes and policies underlying section 10(b) and Rule 10b–5. In construing the Rule's meaning, we must begin with its language. *Chiarella,* 445 U.S. at 226, 100 S.Ct. at 1113; *Santa Fe Industries v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Rule prohibits *"any* person," acting "directly or indirectly," from employing *"any* device, scheme or artifice to defraud." It

equally prohibits *"any* act, practice, or course of business which operates as a fraud or deceit upon *any* person." 17 C.F.R. § 240.10b-5 (emphasis added). This repeated use of the word "any" evidences Congress' intention to draft the Rule broadly. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). The Supreme Court has recognized that section 10(b) of the 1934 Act, as implemented by Rule 10b-5, "was designed as a catchall clause to prevent fraudulent practices." *Chiarella,* 445 U.S. at 226, 100 S.Ct. at 1113 (citing *Ernst & Ernst,* 425 U.S. at 202, 206, 96 S.Ct. at 1385, 1387).

The legislative intent of the 1934 Act is similarly broad-reaching. As this Court has noted in applying the misappropriation theory, "the antifraud provision was intended to be broad in scope, encompassing all 'manipulative and deceptive practices which have been demonstrated to fulfill no useful function.'" *Materia,* 745 F.2d at 201 (quoting S.Rep. No. 792, 73d Cong., 2d Sess., 6 (1934)). We perceive nothing "useful" about defendants' scheme. Nor, in our view, could any purported function of the scheme [6] be considered protected given Congress' stated concern for the perception of fairness and integrity in the securities markets and the potential costs of foresaking such legislated concerns, including fewer market participants and greater reliance on fraud as a means of competing in the market. *See, e.g.,* H.R. 9323, 73d Cong., 2d Sess., Rept. No. 1383 at 7865-66, *reprinted in* 1 Federal Bar Association Securities Law Committee, *Federal Securities Laws* 856-57 (1983) ("a wise and judicious administration of the provisions of this [A]ct will create a new confidence in the integrity of the securit[ies] markets"); Twentieth Century Survey and Study, *cited in* H.R. 9323, *supra,* at 7866, *reprinted in* Federal Securities Laws, *supra,* at 857 (seeking to cre-

ate "a justifiable belief that securit[ies] markets actually were 'free and open'").

In construing Congressional intent, we also find persuasive Congress' recent statements accompanying the Insider Trading Sanctions Act of 1984, P.L. No. 98-376, 98 Stat. 1264 (1984), relating to the purposes and scope of the 1934 Act and its antifraud provisions. *See Eichler v. Berner,* —— U.S. ——, 105 S.Ct. 2622, 2630 n. 23, 2633 n. 32, 86 L.Ed.2d 215 (1985) (construing section 10(b) in light of the provisions and legislative history of the Insider Trading Sanctions Act of 1984); *see also Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969) (subsequent legislative history "entitled to great weight in [prior] statutory construction"); *Consolidated Edison Co. v. United States,* 782 F.2d 322, 324 n. 3 (2d Cir.1986) (per curiam) (noting persuasiveness of subsequent legislative history as to meaning of prior law). The use of subsequent legislative history is especially appropriate where, as here, the original history is limited. *See Santa Fe Industries v. Green,* 430 U.S. 462, 473 n. 13, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (noting paucity of legislative history on section 10(b)); *Ernst & Ernst,* 425 U.S. at 202, 96 S.Ct. at 1385 (same). In enacting the Insider Trading Sanctions Act of 1984, Congress noted that the intent of the 1934 Act was to condemn all manipulative or deceptive trading "whether the information about a corporation or its securities originates from inside or outside the corporation." H.R. Rep. No. 98-355, 98th Cong., 1st Sess. 3, 4 (1983), *reprinted in* [1984] U.S. Code Cong. & Ad. News 2274. Further, the reason for this view was clearly stated: "the abuses sought to be remedied [by section 10(b)] were not limited to actions of corporate insiders and large shareholders." *Id.* Clearly, Congress has understood its predecessors to have delineated illegal conduct along the lines not simply of relationships

---

**6.** *See, e.g.,* Farley, *A Current Look at the Law of Insider Trading,* 39 Bus. Law. 1771, 1782 (1984) (defending "misappropriation" as facilitating the transfer of information vital to market efficiency); *cf.* Fischel, *Insider Trading and Investment* *Analysts: An Economic Analysis of* Dirks v. Securities and Exchange Commission, 8 Hofstra L. Rev. 127, 133 (1984) (defending *Dirks* on same grounds).

to corporations and duties arising thereunder, as developed by the line of cases through *Cady, Roberts* and *Dirks*. Rather, Congress apparently has sought to proscribe as well trading on material, nonpublic information obtained not through skill but through a variety of "deceptive" practices, unlawful acts which we term "misappropriation." *See* Aldave, *Misappropriation: A General Theory of Liability for Trading on Nonpublic Information*, 13 Hofstra L. Rev. 101, 106 & n. 33 (1984).[7]

■ We do not say that merely using information not available or accessible to others gives rise to a violation of Rule 10b-5. That theory of 10b-5 liability has been rejected. *See Chiarella*, 445 U.S. at 235, 100 S.Ct. at 1113 (rejecting "parity of information" theory); *id.* at 235 n. 20, 100 S.Ct. at 1118 n. 20 (rejecting "access to information" theory). There are disparities in knowledge and the availability thereof at many levels of market functioning that the law does not presume to address. However, the critical issue is found in the district judge's careful distinction between "information" and "conduct." 612 F.Supp. at 842. · Whatever may be the legal significance of merely using one's privileged or unique position to obtain material, nonpublic information, here we address specifically whether an employee's use of such information in breach of a duty of confidentiality to an employer serves as an adequate predicate for a securities violation. Obviously, one may gain a competitive advantage in the marketplace through conduct constituting skill, foresight, industry and the like. Certainly this is as true in securities law as in antitrust, patent, trademark, copyright and other fields. But one may not gain such advantage by conduct constituting secreting, stealing, purloining or otherwise misappropriating- material nonpublic information in breach of an employer-imposed fiduciary duty of confidentiality. Such conduct constitutes chicanery, not competition; foul play, not fair play. Indeed, underlying section 10(b) and the major securities laws generally is the fundamental promotion of " 'the highest ethical standards ...' in every facet of the securities industry." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186–187, 84 S.Ct. 275, 279–80, 11 L.Ed.2d 237 (1963) (quoting *Silver v. New York Stock Exchange*, 373 U.S. 341, 366, 83 S.Ct. 1246, 1261, 10 L.Ed.2d 389 (1963)), *cited approvingly in Eichler*, 105 S.Ct. at 2631. We think the broad language and important objectives of section 10(b) and Rule 10b–5 render appellants' conduct herein unlawful, as in *Newman* and *Materia*. *See also, In re Investors Management Co.*, 44 S.E.C. 633, 641 n. 18 (1971) (SEC stating that Rule 10b–5 extends to trading based upon "information ... obtained by industrial espionage, commercial bribery or the like").

We do not think that the "fraud and deceit" in this case significantly differ from the "fraud and deceit" in *Newman* and *Materia*. Winans "misappropriated—stole, to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence." *Chiarella*, 445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting), *quoted in Materia*, 745 F.2d at 201. The information misappropriated here was the *Journal's* own confidential schedule of forthcoming publications. It was the advance knowledge of the timing and content of these publications, upon which appellants, acting secretively, reasonably expected to and did realize profits in securities transactions.[8] Since section 10(b) has been

---

7. *See also* ABA Committee on Federal Regulation of Securities, Report of the Task Force on Regulation of Insider Trading—Part I; Regulation under the Antifraud Provisions of the Securities Exchange Act of 1934, 41 Bus. Law. 223, 235–37, 253–63, 270–71 (1985) (reviewing misappropriation cases and proposing express codification of misappropriation theory without limitation to insiders, quasi-insiders or their tippees).

8. We cannot agree with the conclusion drawn from the view expressed by our brother, Judge Miner, in his dissenting opinion, that the prepublication schedules were not "secrets to which Winans always was privy, since he frequently did not know which writings would be published, when they would be published or even if they would be published." In our view, that statement exalts the exception over the rule. The district court found that between October

found to proscribe fraudulent trading by insiders or outsiders, such conduct constituted fraud and deceit, as it would had Winans stolen material nonpublic information from traditional corporate insiders or quasi-insiders. *See Materia*, 745 F.2d at 201–03. Felis' liability as a tippee derives from Winans' liability given the district court's finding of the requisite scienter on Felis' part. *See Ernst & Ernst*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668.

Nor is there any doubt that this "fraud and deceit" was perpetrated "upon a[ny] person" under section 10(b) and Rule 10b–5. It is sufficient that the fraud was committed upon Winans' employer. *See Materia*, 745 F.2d at 202 (printing press employee liable for fraud upon employer); *Newman*, 664 F.2d at 17 (investment banking employees liable principally for "sullying the reputations" of their employers); *Musella*, 578 F.Supp. at 438 (office manager liable for sullying reputation of law firm). Appellants Winans, and Felis and Carpenter by their complicity, perpetrated their fraud "upon" the *Wall Street Journal*,

1983 and the end of February 1984, twenty-seven "Heard" columns were leaked in advance. 612 F.Supp. at 833. If an occasional investment plan faltered due to nonpublication of the anticipated corollary "Heard" column, the record nonetheless amply demonstrates that the majority of the securities traded resulted in profits reflecting the predictable price change due to the publication anticipated. This was true, for example, of trades in American Surgery Centers, Institutional Investors, and TIE/Communications, Inc., to mention just a few of the securities traded. In any event, a fraudulent scheme need not be foolproof to constitute a violation of Rule 10b–5. It is enough that appellants reasonably expected to and generally did reap profits by trading on the basis of material, nonpublic information misappropriated from the *Journal* by an employee who owed a duty of confidentiality to the *Journal.*

9. We disagree with the view expressed by Judge Miner in his dissenting opinion that no "securities-related" information was purloined. For purposes of Rule 10b–5, an omission (or a misstatement) may be considered "material" if the information omitted (or misstated) "in reasonable and objective contemplation might affect the value of the corporation stock or securities...." *SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 849 (2d Cir.1968) (Waterman, J.) (quoting

sullying its reputation and thereby defrauding it "as surely as if they took [its] money." "*Newman*, 664 F.2d at 17.

As to the "in connection with" standard, the use of the misappropriated information for the financial benefit of the defendants and to the financial detriment of those investors with whom appellants traded supports the conclusion that appellants' fraud was "in connection with" the purchase or sale of securities under section 10(b) and Rule 10b–5. We can deduce reasonably that those who purchased or sold securities without the misappropriated information would not have purchased or sold, at least at the transaction prices, had they had the benefit of that information. *See, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 239 (2d Cir. 1974). Certainly the protection of investors is the major purpose of section 10(b) and Rule 10b–5. *Id.* at 235. Further, investors are endangered equally by fraud by non-inside misappropriators as by fraud by insiders.[9]

*Kohler v. Kohler Co.*, 319 F.2d 634, 642 (7th Cir.1963)), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See also Radiation Dynamics v. Goldmuntz*, 464 F.2d 876, 888 (2d Cir.1972) (approving materiality instruction substantially following language in *Texas Gulf Sulphur*); *cf. TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (holding omission material "if there is a substantial likelihood that a reasonable shareholder would consider it important"). In our view, the satisfaction of this standard, even narrowly defined, is beyond question, given that the "Heard" columns had undisputed significant market impact; that after the first attempt at profits Winans and Felis recognized that profits would be reaped if trades were made on the basis of analyses of *particular* securities (rather than of general industries) to be published in forthcoming columns, *see* 612 F.Supp. at 833; that generally, "transactions were closed on the same day as an article's publication, thereby maximizing its impact," *id.* at 834; and that, once the mature scheme was in operation, net profits therefrom approached $690,000 over several months. *Id.* Indeed, the prices of the twenty-nine stocks traded often changed significantly, sometimes even dramatically, between the closing prices the day before publications and the opening prices at 10:00 a.m. on the day of publications.

Appellants correctly point out that "not every instance of financial unfairness constitutes fraudulent activity under Section 10(b)," *Chiarella,* 445 U.S. at 232, 100 S.Ct. at 1116, 1117; that the "misappropriation theory" requires a nexus between the duty and the federal securities regulatory scheme, *id.* at 245, 100 S.Ct. at 1123; *Newman,* 664 F.2d at 12; *Materia,* 745 F.2d at 197. Here, however, the misappropriated information regarding the timing and content of certain *Journal* columns had "no value whatsoever [to appellants] except 'in connection with' [their] subsequent purchase[s] [and sales] of securities." *Materia,* 745 F.2d at 203. The "sole purpose" of the scheme was to purchase and sell securities, *see Newman,* 664 F.2d at 18; *see also Jannes v. Microwave Communications, Inc.,* 461 F.2d 525, 528–30 (7th Cir. 1972), and thereby virtually to "reap instant no-risk profits in the stock market." *Materia,* 745 F.2d at 203. Indeed, given the breadth of the "in connection with" standard, *see, e.g., Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 815 (2d Cir.1975), appellants' argument to the contrary seems frivolous.

Appellants argue that it is anomalous to hold an employee liable for acts that his employer could lawfully commit. Admittedly, the employers in *Newman* were investment banks that would be barred by federal securities laws from trading in securities of their clients, while in the present case the *Wall Street Journal* or its parent,

Dow Jones Company, might perhaps lawfully disregard its own confidentiality policy by trading in the stock of companies to be discussed in forthcoming articles.[10] But a reputable newspaper, even if it could lawfully do so, would be unlikely to undermine its own valued asset, its reputation, which it surely would do by trading on the basis of its knowledge of forthcoming publications. *See Macey, From Fairness to Contract: The New Direction of the Rules Against Insider Trading,* 13 Hofstra L.Rev. 9, 43 (1984). Although the employer may perhaps lawfully destroy its own reputation, its employees should be and are barred from destroying their employer's reputation by misappropriating their employer's informational property. Appellants' argument that this distinction would be unfair to employees illogically casts the thief and the victim in the same shoes.[11] A more apt analogy might be drawn between the employee-employer distinction herein and the fiduciary-corporate client distinction in *Newman, Materia,* and *Musella.* In these cases, the misappropriation theory prohibited, respectively, an investment bank, a financial printer, or a law firm, from trading on the material, nonpublic information of its corporate client, which itself presumably remained free to trade in its own securities, absent other contrary rules in the securities laws, such as the Williams Act five percent rule, 15 U.S.C. §§ 78m(d), 78n(d). Here, appellants, constrained by the employer's confidentiality policy, could not lawfully trade by fraudulently violating that policy, even if the *Journal,* the employer imposing the policy,

---

**10.** We express no view as to whether trading by a newspaper on the basis of material, nonpublic prepublication information would constitute a securities violation as, *e.g.,* a "manipulative device" under section 10(b); or as unlawful touting under section 17 of the Securities Act of 1933, 15 U.S.C. § 77q (1933), *see* 3 L. Loss, Securities Regulation 1518–19 (1961); or under any other theory.

**11.** Indeed, theft or embezzlement of certain information is a statutory crime in some states. *See, e.g.,* N.Y.Pen.L. § 165.07 (McKinney's 1975) (unlawful use of secret scientific information); Mass.Gen.Laws, Chap. 266, § 30(4) (1985 Supp.)

(theft of secret scientific material). Further, the victim of such theft or embezzlement may have a common law action for conversion against the misappropriator. *See* note 5, *supra.* Indeed, an employee's conversion may serve as the predicate for a securities violation. *Cf. Diamond v. Oreamuno,* 24 N.Y.2d 494, 503, 301 N.Y.S.2d 78, 85, 248 N.E.2d 910, 915 (1969) (Fuld, Ch.J.) (permitting action alleging violation of section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), and section 10(b) if such action is brought by individual purchaser, in pertinent part based on directors' alleged breach of duty of confidentiality to corporation).

might not be said to defraud itself should it make its own trades.

Thus, because of his duty of confidentiality to the *Journal,* defendant Winans—and Felis and Carpenter, who knowingly participated with him—had a corollary duty, which they breached, under section 10(b) and Rule 10b–5, to abstain from trading in securities on the basis of the misappropriated information or to do so only upon making adequate disclosure to those with whom they traded.

The district court properly found that defendants had adequate notice of the illegality of their scheme. *See Newman,* 664 F.2d at 19 (citing *United States v. Persky,* 520 F.2d 283, 288 (2d Cir.1975)). Certainly appellants herein had fair notice from *Chiarella, Newman,* and the decision of the district court in *Materia* that their conduct might violate section 10(b). Although appellants argue that the misappropriation in their case, predicated on breach of a duty to the *Wall Street Journal* rather than to a quasi-insider corporate client, such as a printing company or an investment bank or a law firm, renders the previous cases distinguishable, they clearly treaded closely enough along proscribed lines for the district court to find that they had adequate notice of the illegality of their acts. *See United States v. Ingredient Technology Corp.,* 698 F.2d 88, 96 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); *United States v. Bohonus,* 628 F.2d 1167, 1174 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980).

Finally, we do not agree with the position taken in the brief of *amici curiae* that the district court's decision portends First. Amendment infringements. The confidentiality restrictions stem from the *Wall Street Journal* and Dow Jones company rules, not from any action by the government. Moreover, we cannot see how the convictions will chill free speech. If Win-

ans had respected his employer's reasonable confidentiality policy, he would have had nothing to fear by publishing his "Heard" columns. Indeed, where a columnist uses his position to profit in transactions, at least one court has held that he may be compelled to disclose to his readers his potential financial stake in the impact of his columns. *See Zweig v. The Hearst Corp.,* 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975).[12] The First Amendment generally empowers a journalist with no "special privilege" merely for the exercise of his craft, *see* Cox, *Foreword: Freedom of Expression in the Burger Court,* 94 Harv. L. Rev. 1, 51, 50–55 (1980), and the securities laws require of him, no less than of others, compliance therewith in the pursuit of his financial interests. In short, having failed to sustain their burden of persuasion that application of the securities laws infringed First Amendment rights, *see id.* at 52–53, either directly or through *amici,* appellants remain subject to section 10(b) as a rule of general applicability. *Cf. Zurcher v. Stanford Daily,* 436 U.S. 547, 566, 98 S.Ct. 1970, 1982, 56 L.Ed.2d 525 (1978) (production of evidence in criminal investigation); *Branzburg v. Hayes,* 408 U.S. 665, 680, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972) (same); *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945) (antitrust laws).

## II.

■ We need not dwell at length on appellants' convictions for violating federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. *See* 612 F.Supp. at 843–47. It is clear that "confidential and nonpublic commercial information" may constitute fraudulently misappropriated "property" under the mail fraud statute. *See United States v. Louderman,* 576 F.2d 1383, 1387

---

**12.** *But cf. Chiarella,* 445 U.S. at 231–35, 100 S.Ct. at 1116–18 (also a non-misappropriation case; subsequently holding no duty of disclosure to persons with whom defendant had no prior dealings and no agency or fiduciary relation-

ship). Whether or not a columnist has a duty of disclosure to his readers under federal securities laws, we note that the court in *Zweig* held that he does without reference to the First Amendment.

(9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978); *United States v. Von Barta,* 635 F.2d 999, 1006 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). Although not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud, *id.* at 1002; *Newman,* 664 F.2d at 19, it is clear from *Von Barta* and *United States v. Bronston,* 658 F.2d 920 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), that "the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to another is a violation of the [mail fraud] statute." *Newman,* 664 F.2d at 19 (quoting *Bronston,* 658 F.2d at 926). *See also United States v. Siegel,* 717 F.2d 9 (2d Cir.1983). In the present case, the scheme to misappropriate material non-public information regarding the *Journal's* forthcoming publications in breach of the employee's duty of confidentiality to the *Journal* in connection with securities transactions met the requirements of the above cited cases and, as noted *supra,* threatened to harm the *Journal's* reputation for professionalism and integrity.

■ Appellants may not successfully claim that they did not "cause" the use of interstate mail and wire communications for purposes of 18 U.S.C. §§ 1341 or 1343. It is sufficient that appellants knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954); *United States v. Muni,* 668 F.2d 87 (2d Cir.1981). Certainly appellants understood that the interstate mailings and wirings associated with the publication and distribution of the *Wall Street Journal* was "a normal and customary part" of that business. *Muni,* 668 F.2d at 90. Although the mailings and wirings did not result from the fraud itself, we agree with the district court that their foreseeability and centrality to the scheme were sufficient predicates to allow a conclusion that appellants violated the mail and wire

fraud statutes. Indeed, the mailings and wirings in this case were considerably more important to this scheme than were the incidental telephone calls by merchandisers in *Muni* for authority to make credit card sales.

■ Regarding the requisite specific intent to defraud under the mail and wire fraud statutes, it is sufficient that the district court found that Winans and Felis intended to deceive and defraud the *Journal,* and that Carpenter knowingly aided and abetted Winans and Felis in that effort. *See United States v. Gregg,* 612 F.2d 43, 50 (2d Cir.1979) ("knowledge of and desire to assist the criminal activity of the principal and intent to injure or defraud" held sufficient).

### III.

■ Appellants individually and collectively also make some collateral arguments, which we address in pertinent part below. Carpenter argues that his acquittal on the conspiracy charge is inconsistent with his conviction for aiding and abetting. The two crimes involve distinct standards of proof: the former requires "proof of a conspiratorial agreement," while the latter requires proof merely that a defendant "in some way associate himself with the venture, that he participate in it ... [and] that he seek by his action to make it succeed." *United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir.1975); *see also United States v. Jackson,* 778 F.2d 933, 940 (2d Cir.1985) (Friendly, J.) ("the offenses of conspiring and of aiding and abetting, while closely allied, are distinct"). We think that the district court properly applied these distinct standards to, *inter alia,* Carpenter's knowledge of the scheme, his endorsement of checks, and his allowing Winans to trade in his name in the Merrill Lynch and Schwab accounts.

■ Nor are we persuaded that the evidence was insufficient to substantiate the district court's conclusions as to any of the counts, with one exception. We think the district court erred in holding Winans liable

under counts 15, 20, and 23, to the extent that those counts involved Felis' trades on behalf of Felis' friend, Stephen Spratt. The district court found that "Felis used the information obtained from Winans beyond the scope of the original agreement." 612 F.Supp. at 835. The record evidence supports the conclusion that Winans' trading agreement with Felis was limited to specific persons. Winans, therefore, may not be found liable as to Felis' trades with or on behalf of Spratt, as to whom Winans had no agreement or knowledge. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). However, we emphasize that Winans might have been liable for the Spratt trades had the scope of the trading agreement been broader, to include trading by or for persons other than the small group of conspirators herein, *see Pinkerton,* 328 U.S. at 646–47, 66 S.Ct. at 1183–84 (liability for acts of co-conspirator "in furtherance of the conspiracy"), or had the trades been "part of the ramifications of the plan which could ... be reasonably forseen as a necessary or natural consequence of the unlawful agreement," *id.* at 648, 66 S.Ct. at 1184, or perhaps had Winans at least known of the Felis-Spratt relationship, *see United States v. Bennett,* 665 F.2d 16, 20 n. 4 (2d Cir. 1981) (government "need prove only that the defendant was a member of the conspiracy and that the illegal acts lay within the scope of the conspiracy and were a foreseeable consequence of it"). We further note that the Spratt counts were among the counts on which Winans received a sentence of concurrent probationary terms.

IV.

We conclude where we left off in *Materia,* that "[f]or all intents and purposes," the liability of Carpenter, Winans and Felis "was settled fifty years ago." *Materia,* 745 F.2d at 203. Congress' enactment in 1934 of a "comprehensive yet open-ended statutory scheme, capable of ongoing adaptation and refinement," *id.,* proscribes the misappropriation and deception that appellants perpetrated herein. To hold otherwise would undermine Congress' ideal in 1934 of "an open and honest market," *id.,* in which superior knowledge in the securities markets would be achieved honestly, fairly, and without resort to pernicious conduct.

Winans' conviction for conspiracy involving the Spratt trades is reversed. In all other respects, the judgment of the district court is affirmed.

MINER, Circuit Judge, dissenting in part:

Since I am of the opinion that the misappropriation theory cannot be interpreted so expansively as to encompass the activities of these defendants, I respectfully dissent from so much of the majority opinion as affirms the convictions for securities fraud.

Until today, the misappropriation theory of criminal liability for securities fraud was applied only in those cases involving the taking and use of non-public, confidential, *securities-related* information by those who obtain that information through special relationships with their sources of knowledge. *S.E.C. v. Materia,* 745 F.2d 197 (2d Cir.1984) (employee of printing establishment traded in securities on the basis of confidential takeover-target data stolen from his employer), *cert. denied,* —— U.S. ——, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *United States v. Newman,* 664 F.2d 12 (2d Cir.1981) (employees of investment banks purchased securities on the strength of misappropriated confidential merger and acquisition information entrusted to the banks by corporate clients), *aff'd after remand,* 722 F.2d 729, *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *S.E.C. v. Musella,* 578 F.Supp. 425 (S.D.N.Y.1984) (manager of office services for law firm improperly acquired tender offer information and traded on it in violation of fiduciary duty to firm and its clients). "[T]he theory premises liability on a party's deception of those who have given him privileged access to confidential information." Aldave, *Misappropriation: A General Theory of Liability*

*for Trading on Nonpublic Information,* 13 Hofstra L. Rev. 101, 124 (1984).

No confidential securities information imparted by reason of any special relationship was purloined by these defendants. The "Heard" columns written by Winans consisted of high quality, accurate articles dealing with the strengths and weaknesses of various securities, and the research data upon which the columns were based were fully available to the public. To say that the "publication schedule" of the Wall Street Journal was the non-public, confidential information stolen by the defendants is to extend the sweep of section 10(b) and rule 10b–5 beyond all reasonable bounds. Knowledge of publication dates simply is not the special securities-related knowledge implicated in the misappropriation theory. Moreover, it cannot be said that the schedules were secrets to which Winans always was privy, since he frequently did not know which writings would be published, when they would be published or even if they would be published.

While the proscription of fraudulent and deceptive practices in connection with the purchase and sale of securities is a broad one, it never was intended to protect the reputation, or enforce the ethical standards, of a financial newspaper. *Cf. A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 396 (2d Cir.1967) (section 10(b) and rule 10b–5 were "designed to protect both investors and 'the public interest' "). It seems especially ludicrous for the government to contend that the court should enforce the Wall Street Journal's conflict of interest policy prohibiting employees from trading on the basis of pre-publication information while conceding that the Journal itself is not prohibited from trading on such information. Harm to reputation, rather than to securities markets or market participants, never has been recognized as a proper subject for redress under section 10(b) or rule 10b–5.

In sum, I do not believe that the securities fraud provisions were designed to prohibit the type of fraudulent conduct engaged in by these defendants. Such conduct is addressed adequately by the statutes establishing the mail and wire fraud offenses of which the defendants stand convicted. Under those statutes, it is sufficient for the imposition of criminal liability that an employee has failed to disclose to his employer *any material information* he is under a fiduciary duty to disclose. *Newman,* 664 F.2d at 19; *United States v. Bronston,* 658 F.2d 920 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).